

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

## NO. AP-75,634

**ADRIAN ESTRADA, Appellant**

**v.**

**THE STATE OF TEXAS**

### ON DIRECT APPEAL
### FROM CAUSE NO. 2006-CR-2079 IN THE 226ᵀᴴ JUDICIAL DISTRICT COURT
### BEXAR COUNTY

HERVEY, J., delivered the opinion of the Court in which KELLER, P.J., MEYERS, JOHNSON, KEASLER, HOLCOMB and COCHRAN, JJ., joined. PRICE and WOMACK, JJ., concurred.

### O P I N I O N

Appellant was convicted of capital murder for murdering Stephanie Sanchez ("Sanchez") and their thirteen-week-old unborn child on December 12, 2005. *See* §§ 19.03(a)(7)(A), TEX. PEN. CODE (making it a capital offense to intentionally or knowingly murder more than one person during the same criminal transaction); 1.07(26), TEX. PEN. CODE (defining an individual to include an unborn child). Pursuant to the jury's answers to the special issues, the trial court sentenced appellant to death. Appellant raises forty-four points of error on direct appeal. We will sustain point of error two

and reverse and remand this case for a new punishment hearing. We overrule all guilt-phase points of error and all other punishment-phase points of error that we find necessary to address.

Appellant claims in point of error one that the evidence is legally insufficient to support the jury's affirmative answer to the future-dangerousness special issue. Viewed in the light most favorable to the jury's finding on this issue, the evidence shows that appellant was a youth pastor at a church in San Antonio. Sanchez was in appellant's youth group, and she lived with her mother and father and her three younger siblings. Appellant and Sanchez began having sex when Sanchez was sixteen years old and appellant was twenty years old. Appellant impregnated Sanchez three times. The first time, Sanchez got an abortion. The second time, she miscarried. The third time, Sanchez decided to have the baby. Appellant told Sanchez that he wanted to share his life with her and their baby. Appellant did not tell Sanchez that he was having sex with another underage girl (Vargas) in his youth group.

Soon after this, the then 22-year-old appellant went to Sanchez's home at a time when he knew that she would be alone. Sanchez was seventeen years old and thirteen weeks pregnant. Appellant choked Sanchez and stabbed her eight times in the back and five times in the back of the head and neck. Appellant left Sanchez's body on the kitchen floor knowing that her father and siblings would be home soon and find her. The medical examiner testified that Sanchez's cause of death was "multiple stab wounds and manual strangulation." Several of the stab wounds in Sanchez's back fractured some ribs and penetrated a lung. The unborn child received no stab wounds during the attack. The medical examiner testified that a separate autopsy was performed on the unborn child and that there was nothing "wrong with that child that would cause death except the fact that the mother had–was dead."

Vargas testified that appellant told her about two weeks before the murders that he wished that he could kill Sanchez. Appellant told the police that he killed Sanchez when she attacked him with a knife and that he stabbed her because "she wasn't dying" when he was choking her. Appellant also told the police that Sanchez was ruining his life.

The evidence also shows that appellant committed indecency with a child with another girl (Reyes) in his youth group when Reyes was fifteen years old. Appellant threatened to "ruin" a former member (Natera) of the youth group after she threatened to reveal appellant's relationship with Vargas. The State presented evidence that, if sentenced to life in prison without parole, appellant would have opportunities to commit violent crimes in prison and he would have contact with a number of people in prison including female guards and female employees. The State also presented evidence that male prisoners having sex with female guards is "not an isolated phenomenon" and that this "compromises the system when that happens, it compromises security." The State presented other evidence that there have been hostage situations in prison "involving rape, very brutal assaults and murder against female guards" and "female employees." Evidence was also presented that there is less of an incentive for a sentenced-to-life-without-parole inmate to behave in prison.[1]

---

[1] Both defense expert Larry Fitzgerald and State expert A.P. Merillat agreed that an incentive that an inmate has for good behavior in prison is the possibility of early release on parole. For example:

> Q. [STATE]: Would you agree with the part where he talks about the younger people coming in with large, large, large stretches of time that they are going to have to be there, and, for instance, in the case of someone who has received life without parole, that they really have nothing to lose when they come into the system, because they are going to be there forever?

Appellant presented the testimony of two witnesses (Casas and Labatt), who provided evidence of appellant's good character. Appellant presented evidence that he was not a disciplinary problem during his pretrial incarceration. Appellant also presented evidence from which a jury could conclude that not very many violent crimes are committed by prison inmates and that a sentenced-to-life-without-parole appellant would not be dangerous in prison.

Point of error one asserts that "[r]emorseful, peaceful, non-violent, and a model prisoner subject to lifetime incarceration if not executed, Adrian Estrada poses absolutely no threat of future danger and the State's showing of future dangerousness was legally insufficient." The future-dangerousness special issue asks a jury to decide "whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society." *See* Article 37.071, § 2(b)(1), TEX. CODE CRIM. PROC.

---

A. [FITZGERALD]: I guess in theory I would agree with that.

\* \* \*

Q. [STATE]: Now, what–would you agree with [defense expert witness] Mr. Fitzgerald that the highest incentive that someone has to be good in prison is probably this effort to get some sort of early release or earn good time?

A. [MERILLAT]: Yes, ma'am. Most inmates, when they freshly arrive at a prison, their cases are on appeal, so they're not–they don't want to do things that's going to harm that possibility, maybe their appeal's going to go through and they are going to be looked at for a possible release from prison. So, naturally, you're going to want to gauge your behavior to not bring ugliness against your record when your–there's a possibility you could be set free.

Also, if you're–if you have a doable number of years with the prison system–excuse me–with a prison sentence, your behavior is going to determine how the parole board looks at you when they do your reviews, your periodic reviews for parole possibility. And you can gauge your behavior according to that. If you want to be known as a bad guy and commit violence and bad acts and such as that and not care what the parole board thinks or people who might be looking at your particular sentence, then, of course, it doesn't matter. But to some inmates it does matter.

Appellant claims that the evidence is legally insufficient to support the jury's affirmative answer to the future-dangerousness special issue under this Court's decision in *Berry v. State*.[2] We understand appellant to argue that *Berry* should be read to require the future-dangerousness special issue to first ask a jury whether a life-sentenced capital defendant would be dangerous to prison society while incarcerated in prison and then whether the defendant would be dangerous to free society if the defendant is ever released on parole.[3] Appellant further argues that the evidence in this case shows that he is dangerous only to teenage girls and that, "[i]f allowed to live, [he] will spend the rest of his life in prison" where he would not "have access to teenage women, much less that he would be placed in an authority position over them."

We do not read *Berry* as adopting appellant's interpretation of the future-dangerousness special issue. This Court's case law has construed the future-dangerousness special issue to ask whether a defendant would constitute a continuing threat "whether in or out of prison" without regard to how long the defendant would actually spend in prison if sentenced to life. *See, e.g., Druery v. State*, 225 S.W.3d 491, 506-07 (Tex. Crim. App. 2007) ("State has the burden of proving beyond a reasonable doubt that there is a probability that [the defendant] would commit criminal acts of violence in the future, so as to constitute a continuing threat, whether in or out of prison"); *Smith*

---

[2] 233 S.W.3d 847 (Tex. Crim. App. 2007).

[3] We note that the applicable law in *Berry* provided that a life-sentenced capital defendant's minimum parole eligibility was forty years. In 2005, the Legislature amended Article 37.071 to provide that a life-sentenced capital defendant would no longer be eligible for parole. *See, e.g.,* Article 37.071, § 2(g), TEX. CODE CRIM. PROC.; *see also* Acts 2005, 79th Leg., R.S., ch. 787, §§ 7, 8, 9, page 2706 (SB 60), eff. September 1, 2005.

*v. State*, 898 S.W.2d 838, 846 (Tex. Crim. App. 1995) (plurality op.)[4] (how long a life-sentenced capital defendant will spend in prison "is not proper even in the context of the [future-dangerousness] special issue because when a jury is considering whether a defendant represents a continuing threat to society, the term 'society' includes *both* the prison and non-prison populations") (emphasis in original); *Muniz v. State*, 851 S.W.2d 238, 250 (Tex. Crim. App. 1993) (State required to prove that the defendant "would, more likely than not, commit violent criminal acts in the future so as to constitute a continuing threat to society whether in or out of prison"). This "commonsense" or "core" interpretation of the future-dangerousness special issue is also consistent with the Legislature's use of the word "would" instead of "will" in this special issue.[5] It is also consistent with this Court's prior cases deciding that the phrase "continuing threat to society" in the future-dangerousness special issue need not be defined in the jury charge because jurors are "supposed to

---

[4]

*See also Broxton v. State*, 909 S.W.2d 912, 919 (Tex. Crim. App. 1995) (adopting the reasoning of the plurality opinion in *Smith*).

[5]

*See, e.g.,* http://www.wordpower.ws/grammar/gramch08.html ("The modal auxiliary **would** is the past form of the modal auxiliary **will**. For this reason, the auxiliary would can be used to form what is sometimes called a **future in the past**.") (emphasis supplied); http://grammar.ccc.commnet.edu/grammar/auxiliary.htm ("will" and "would" are "helping verbs called modal auxiliaries or modals" with "will" used to express, among other things, a prediction and "would" used in a main clause to express, among other things, "a hypothetical meaning or a sense of probability") (emphasis supplied); Eric F. Citron, Note: *Sudden Death: The Legislative History of Future Dangerousness and the Texas Death Penalty*, 25 Yale L. & Pol'y Rev. 143, 156 (Fall 2006) (construing the future-dangerousness special issue as "a literal prediction of future behavior" seems unlikely "because the term 'would' suggests the presence of an unspoken, logical predicate–of something that would happen if X were the case") and at 157 ("It might be argued that . . . the future dangerousness question has a certain 'commonsense' or 'core' meaning that would not escape the lay juror forced to consider it. That meaning might be something like the following: is this defendant the sort of person who if left to her own devices would hurt or kill again-a bad person? One of the original drafters of the standard, former state senator Jack Ogg, now seems to admit that he imagined an inquiry along these lines."); *see also Smith*, 898 S.W.2d at 851 n.19 (future-dangerousness special issue presents a "**much more abstract**" question) (emphasis supplied).

know" its "common meaning." *See King v. State*, 553 S.W.2d 105, 107 (Tex. Crim. App. 1977).

We also note that this Court has characterized appellant's interpretation of the future-dangerousness special issue as "a complex, backward analysis." *See Matchett v. State*, 941 S.W.2d 922, 939 (Tex. Crim. App. 1996) (permissible for jury to consider the threat that defendant posed to "society" without "distinguishing between 'free' or 'prison' society and without developing a 'parole' scenario by which [defendant] might become a threat to 'free society'"). And in *Chamberlain v. State*, 998 S.W.2d 230, 235 n.2 (Tex. Crim. App. 1999), this Court decided that the trial court did not err to refuse the defendant's requested jury charge that stated:

> When you decide whether the Defendant will continually commit violent crimes, you must consider the fact that if given a life sentence he will be sentenced to life in prison and will therefore not live among society in the free world. Thus, if you believe that the Defendant will not continually commit violent crimes in prison, you must answer [the future-dangerousness special issue] "no", even if you believe there is a likelihood he would do so if he was a free man.

We further note that, before 1999, when the Legislature enacted legislation that permitted a trial court to submit a minimum-parole-eligibility jury instruction at the defendant's request, this Court would reject a capital defendant's claim that he was entitled to a minimum-parole-eligibility jury instruction because the term "society" in the future-dangerousness special issue included both free and prison society. *See Smith*, 898 S.W.2d at 846.[6] This is further support for the view that this

---

[6] In 1999, the Legislature enacted legislation that permitted a trial court to submit a minimum-parole-eligibility instruction at the defendant's request (this legislation was repealed in 2005 in favor of a life-without-parole sentencing option, *see* footnote 3). *See* Acts 1999, 76th Leg., R.S., ch. 140, § 1, page 600 (SB 39), eff. September 1, 1999. This legislation apparently was meant to address due-process concerns expressed by the Supreme Court in *Simmons v. South Carolina* and to correct any juror misunderstanding that a life-sentenced capital defendant would soon be released from prison. *See Simmons v. South Carolina*, 512 U.S. 154, 161-62 (1994) ("In this case, the jury reasonably may have believed that petitioner could be released on parole if he were not executed. To the extent that this misunderstanding pervaded the jury's deliberations, it had the effect of creating a false choice

Court believed that the future-dangerousness special issue asks a jury to decide whether a defendant would be dangerous "whether in or out of prison" without regard to how long the defendant would actually spend in prison if sentenced to life.

In addition, we find that this case is distinguishable from *Berry*.[7] In *Berry*, this Court decided that the evidence was legally insufficient to support an affirmative answer to the future-dangerousness special issue because the evidence showed that the defendant, who killed one new-born infant and attempted to kill another infant five years later, was dangerous to only some, but not

---

between sentencing petitioner to death and sentencing him to a limited period of incarceration. This grievous misperception was encouraged by the trial court's refusal to provide the jury with accurate information regarding petitioner's parole ineligibility, and by the State's repeated suggestion that petitioner would pose a future danger to society if he were not executed.") and at 180 (Scalia, J., dissenting); *Smith*, 898 S.W.2d at 851 n.19 (noting that the "concept of future dangerousness throughout the opinion in *Simmons* is different than that in Texas" because the prosecutor in South Carolina "is urging the jury to sentence an individual to death because he will at some future date be released from prison" while the inquiry in Texas is whether a defendant would commit criminal acts of violence "whether he is in prison or out of prison" which "is much more abstract than that asked in the argument" in *Simmons*).

[7] The State also claims that this case is distinguishable from *Berry*. The State argues that, "although [its] punishment evidence did revolve around Appellant having committed additional offenses of sexual assault of a child and indecency with a child against two more girls in the youth group he pastored, the evidence also went to Appellant's character" and that this evidence "shines a bright light on Appellant's depraved character and evidences a man who poses a threat to any and all persons that come into contact with him." The State further argues:

> There is ample evidence in this case which renders Appellant deathworthy; the manner of death by strangulation and stabbing with a knife, the proof that Appellant stabbed [Sanchez] while unconscious and face down on the floor, Appellant not leaving until he believed the pregnant victim was dead, Appellant's casual trip to Wal-Mart and the gym while his victims were dying, Appellant's uncharged criminal offenses and prior bad acts that show a pattern of intentionally and habitually disobeying the law and any authority over him, and character evidence that demonstrates Appellant is a self-obsessed individual that consistently engages in deceit, intimidation and manipulation to promote himself.

all, of her newborn children, which she would not likely have during her child-bearing years in prison. *See Berry*, 233 S.W.3d at 863-64. In *Berry*, this Court essentially decided that a jury could not rationally find that the defendant was dangerous to anyone other than her own children which she would not have during her child-bearing years in prison. *See id*. The evidence in this case supports a finding that appellant is dangerous to a broader range of potential victims than only his unborn children. The evidence also shows that, unlike Berry, who was parole eligible, a life-sentenced appellant would be parole ineligible, and evidence was presented from which a jury could rationally find that a parole-ineligible inmate could be more dangerous in prison than a parole-eligible inmate.

We also understand appellant to argue that, when the Legislature amended Article 37.071 in 2005 to provide that a life-sentenced capital defendant would no longer be eligible for parole (*see* footnote 3), it also intended that the future-dangerousness special issue should be construed to ask a jury to determine whether a defendant would be dangerous only in prison unless the State could prove beyond a reasonable doubt that there is a probability that the defendant would escape or otherwise be released from prison. Appellant argues:

> In those cases [holding that the future-dangerousness special issue focuses on a defendant's future dangerousness "whether in or out of prison"], however, life without parole was not the alternative sentencing option, as now required Art. [sic] 37.071 § 2(g). Now, for the jury to consider a defendant's danger in the free world, it would have to find proof beyond a reasonable doubt that there was a probability the defendant would escape or be released from prison outside the present law. Art. 37.071 § 2(g).

We have found nothing to indicate that the Legislature has intended that the future-dangerousness special issue should, contrary to this Court's prior holdings, be construed to ask a jury to determine whether a life-sentenced-without-parole capital defendant would be dangerous only to

prison society unless the State could prove beyond a reasonable doubt that the defendant would get out of prison through means of escape or otherwise. We reaffirm this Court's prior holdings that the future-dangerousness special issue asks a jury to determine whether there is a probability that the defendant would constitute a continuing threat to society "whether in or out of prison." *See Muniz*, 851 S.W.2d at 250.

Therefore, in reviewing the legal sufficiency of the evidence to support the jury's affirmative answer to the future-dangerousness special issue, we view the evidence in the light most favorable to the jury's answer to this special issue and determine whether any rational trier of fact could have found beyond a reasonable doubt that there is a probability that appellant would constitute a continuing threat "whether in or out of prison." *See Druery*, 225 S.W.3d at 506-07. Appellant cites to several of this Court's older cases, which decided that the evidence was insufficient to support an affirmative answer to the future-dangerousness special issue primarily because the facts of the offense were insufficient to support such an answer and because there was no other evidence, such as psychiatric or nonpsychiatric opinion testimony, that would support a finding of future dangerousness.[8] Appellant claims that he "easily poses an equally low (if not lower) threat of future danger than the defendants in all of the[se] cases."

---

[8]

*See Ellason v. State*, 815 S.W.2d 656, 659 (Tex. Crim. App. 1991); *Smith v. State*, 779 S.W.2d 417, 419-21 (Tex. Crim. App. 1989); *Huffman v. State*, 746 S.W.2d 212, 224-25 (Tex. Crim. App. 1988); *Marras v. State*, 741 S.W.2d 395, 407-08 (Tex. Crim. App. 1987), *overruled on other grounds*, *Garrett v. State*, 851 S.W.2d 853, 860 (Tex. Crim. App. 1993); *Keeton v. State*, 724 S.W.2d 58, 61-64 (Tex. Crim. App. 1987); *Garcia v. State*, 626 S.W.2d 46, 51 (Tex. Crim. App. 1981); *Roney v. State*, 632 S.W.2d 598, 601-03 (Tex. Crim. App. 1982); *Wallace v. State*, 618 S.W.2d 67, 69 (Tex. Crim. App. 1981); *Brasfield v. State*, 600 S.W.2d 288, 293-94 (Tex. Crim. App. 1980), *overruled on other grounds*, *Janecka v. State*, 739 S.W.2d 813, 819 (Tex. Crim. App. 1987); *Warren v. State*, 562 S.W.2d 474, 476-77 (Tex. Crim. App. 1978).

In reviewing a jury's affirmative answer to the future-dangerousness special issue, this Court has stated that each case must be resolved on its own facts. *See Dinkins v. State*, 894 S.W.2d 330, 357-61 (Tex. Crim. App. 1995) (discussing and distinguishing some of this Court's older cases, including some cited by appellant in this case, in deciding that the evidence was sufficient to support jury's affirmative answer to future-dangerousness special issue). In this case, we decide that the evidence of appellant's unremorseful, premeditated,[9] brutal murders of Sanchez and their unborn child by stabbing Sanchez thirteen times, of his pattern of using his position of trust as a youth pastor to take sexual advantage of underage girls in his youth group, of his threat to "ruin" another former member of the youth group when she threatened to expose appellant, and of the opportunities for a life-sentenced-without-parole appellant to commit violence in prison are sufficient to support the jury's affirmative answer to the future-dangerousness special issue. *See Trevino v. State*, 991 S.W.2d 853-54 (Tex. Crim. App. 1999) (future dangerousness can be inferred from evidence showing a lack of remorse); *Ex parte Tennard*, 960 S.W.2d 57, 59 (Tex. Crim. App. 1997) (referencing State's argument, "Look at the facts of the crime itself. You know pulling a trigger on a pistol is a fairly easy way to kill someone. Not easy, but it's a detached way. It takes a special dedication to violence to plunge a knife into a human body sixteen times."); *Dinkins*, 894 S.W.2d at 359-61 (evidence of premeditated and brutal murders of two women, including multiple gunshot

---

[9] Appellant argues that the evidence does not support findings of his premeditation and lack of remorse. We disagree. A jury could reasonably infer premeditation from evidence that appellant expressed a desire to kill Sanchez a couple of weeks before the murders and that he came to the Sanchez home and committed the murders when he knew that Sanchez would be home alone. A jury could reasonably infer lack of remorse primarily from the evidence of appellant's demeanor during the police interview such as his complaining about Sanchez "ruining his life" not long after he had brutally murdered her and their unborn child.

wounds at close range of one of the victims, was sufficient to support affirmative answer to future-dangerousness special issue and the "character evidence uniformly favorable to" the defendant was "alone insufficient to mitigate the premeditation and brutality of the offense"); *Hawkins v. State*, 660 S.W.2d 65, 82 (Tex. Crim. App. 1983) (evidence sufficient to support affirmative answer to future-dangerousness special issue where evidence showed that the defendant raped a woman who was six months pregnant and who bled to death as result of stab wounds that the defendant inflicted). On this record, we cannot conclude that it would be irrational for a jury to find beyond a reasonable doubt that there is a probability that appellant would constitute a continuing threat "whether in or out of prison." *See Druery*, 225 S.W.3d at 506-07; *Muniz*, 851 S.W.2d at 250. Point of error one is overruled.

Appellant claims in point of error five that a "[f]actual sufficiency review of future dangerousness is constitutionally required." We have held that a factual sufficiency review of the jury's answer to the future-dangerousness special issue is not constitutionally required. *See McGinn v. State*, 961 S.W.2d 161, 169 (Tex. Crim. App. 1998). Point of error five is overruled.

Appellant claims in point of error six that the "Texas future danger inquiry results in the death penalty's arbitrary and disproportionate imposition, violating the Eighth Amendment." Appellant argues that the "capital statute employs an unreliable inquiry into future dangerousness as a criterion to narrow the class of murders eligible for the death penalty, producing arbitrary and capricious as well as disproportionate results."

The Supreme Court decided in *Jurek v. Texas* that Section 19.03 sufficiently narrows the categories of murders for which a defendant is eligible for the death penalty and that the future-dangerousness special issue has "a common-sense core meaning and that criminal juries should be

capable of understanding" it. *See Jurek v. Texas*, 428 U.S. 262, 270-71 (1976) (joint opinion of Stewart, Powell, and Stevens, JJ.) and at 278-79 (White, J., joined by Burger, C.J., and Rehnquist, J.); *King*, 553 S.W.2d at 107 (jury instruction defining "continuing threat to society" not required because jurors are "supposed to know" its "common meaning").[10]  The Supreme Court has also recently stated that the "imprecision and the tension between evaluating the individual circumstances and consistency of treatment" resulting from what the jury must find in considering the future-dangerousness issue is constitutionally tolerable "where the victim dies." *See Kennedy v. Louisiana*, 128 S.Ct. 2641, 2661 (2008).  Point of error six is overruled.[11]

In point of error seven, appellant claims that the "Texas future dangerousness scheme violates Texas's Constitutional Proscription against cruel *or* unusual punishment."  We have rejected this claim. *See Anderson v. State*, 932 S.W.2d 502, 509-10 (Tex. Crim. App. 1996).  Point of error seven is overruled.

In point of error two, appellant claims that "[b]y presenting false and misleading testimony on a crucial issue at the penalty phase of his trial, the State violated [appellant's] constitutional rights under the Fifth, Sixth, Eighth and Fourteenth Amendments."  The State responds that "in the interest

---

[10]

*See also* Citron, *supra* at 156 (suggesting that future-dangerousness special issue has a certain "commonsense" or "core" meaning that would not escape the lay juror forced to consider it: is the defendant the type of person who, if left to his own devices, would hurt or kill again?)

[11]

The future-dangerousness special issue also has the effect of further narrowing those eligible for the death penalty while performing a constitutionally required function of requiring the jury to make an individualized determination of whether the death penalty should be imposed. *See Jurek*, 428 U.S. at 271 (Eighth Amendment requires narrowing of categories for determining which defendants are eligible for death penalty and also individualized sentencing for determining which of these defendants will receive the death penalty); *Smith*, 779 S.W.2d at 420; *Green*, 912 S.W.2d at 196-97 (Baird, J., concurring) (discussing eligibility and selection decisions in the capital decision-making process).

of justice, [it] believes Appellant is entitled to a new trial on punishment due to the error raised in Appellant's second point of error." While the State's confession of error in a criminal case is important and carries great weight, we are not bound by it. *See Saldano v. State*, 70 S.W.3d 873, 884 (Tex. Crim. App. 2002). This Court must still independently examine the error confessed because "our judgments are precedents, and the proper administration of the criminal law cannot be left merely to the stipulation of parties." *See id*.

The punishment-phase record reflects that appellant presented the testimony of Larry Fitzgerald to discuss the classification system within the Texas Department of Criminal Justice (TDCJ) for a sentenced-to-life-without-parole inmate convicted of capital murder. Fitzgerald testified about the "G" classification system and how it places restrictions on an inmate's housing, job placement, movement, commissary, and recreation time. Fitzgerald also testified concerning how the G classification system ranks inmates from the least restrictive status of G-1 to the most restrictive status of G-5. Fitzgerald testified that the least restrictive G status that a sentenced-to-life-without-parole capital murderer could obtain is a G-3 classification. The State presented A.P. Merillat as a rebuttal witness. Merillat testified, without objection, that, after 10 years of G-3 status, a sentenced-to-life-without-parole capital murderer could achieve a lower (and less restrictive) G classification status than a G-3 status.

During its punishment-phase deliberations, the jury sent out two notes at separate times. The first note asked what would happen if the jury could not "come to a decision" on the future-dangerousness special issue. The second note asked, "Based on the testimony of Fitzgerald and Merillat is there a possibility that the defendant would be eligible for a less restrictive status after 10 years (or some other period of time)." The trial court responded to both of these notes by

responding, "You have the law and the evidence. Please continue your deliberations."

On appeal, both appellant and the State represent to this Court that Merillat's testimony that a sentenced-to-life-without-parole capital murderer could, after ten years, obtain a lower G classification status than a G-3 status was incorrect (both parties seem to agree that Merillat's incorrect testimony was not intentional). Appellant claims that the admission of this incorrect testimony violated several of his constitutional rights. And the State asserts that the "jury's questions suggest that Merillat's mistaken testimony may have contributed to the jury's decision on punishment." The State "recommends that, in the interest of justice, Appellant should receive a new trial on punishment."

Both the State and appellant ask this Court to take judicial notice of a July 2005 TDCJ regulation which, both parties agree, unambiguously shows, "Effective 9/1/05, offenders convicted of Capital Murder and sentenced to 'life without parole' will not be classified to a custody less restrictive than G3 throughout their incarceration" (it appears that before September 1, 2005, a sentenced-to-life-with-the-possibility-of-parole capital murderer could have obtained a lower and less restrictive G-3 status after ten years). This Court will take judicial notice of this TDCJ regulation. *See* TEX. R. EVID. 201(b) (judicially noticed fact must be one not subject to reasonable dispute in that it is capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned); 201(c) (a court may take judicial notice, whether requested or not); 201(d) (a court shall take judicial notice "if requested by a party and supplied with the necessary information").[12]

---

[12]

In his amended brief, appellant claims:

We have judicially noticed the TDCJ regulation. This information, now properly before this Court, demonstrates there is a fair probability that appellant's death sentence was based upon Merillat's incorrect testimony as evidenced by the jury's notes. *See Simmons*, 512 U.S. at 160, 165-66 (defendant "was prevented from rebutting information that the [jury] considered, and upon which it may have relied, in imposing the sentence of death" and jury "was denied a straight answer about [defendant's] parole eligibility even when it was requested" in a jury note). We believe that the Supreme Court would find this to be constitutionally intolerable. *See id*.; *Johnson v. Mississippi*, 486 U.S. 578, 590 (1988) (death sentence based on "materially inaccurate" evidence violates Eighth Amendment); *Townsend v. Burke*, 334 U.S. 736, 740-41 (1948) (it violates due process to base conviction on "materially untrue" information "whether caused by carelessness or design"); *Ex parte Chabot*, 300 S.W.3d 768, 771 (Tex. Crim. App. 2009) (State's unknowing use of perjured testimony violates due process); *Ex parte Carmona*, 185 S.W.3d 492, 497 (Tex. Crim. App. 2006) (plurality op.) (revocation of community supervision based solely on perjured testimony violates due process). After having independently examined the merits of the State's confessed error, we are satisfied that appellant presents a meritorious substantive claim in point of error two.

The issue thus becomes whether this Court should grant relief on the merits of this claim because it was not, but apparently could have been, raised in the trial court. In *Saldano*, a State's expert testified "about statistical, 'identifying markers' which help experts determine whether there

---

The TDCJ's [July 2005] regulation existed at the time of this 2007 trial, its accuracy cannot be reasonably disputed and it is verifiable through TDCJ. Thus, taking judicial notice is fully appropriate and within this Court's discretion. This Court should exercise its discretion to do so in order to rectify Appellant's unjust death sentence, which, as explained below, is predicated on the State's misrepresentation of TDCJ policy.

is a probability that a defendant will present a future threat" and that one "of the factors that . . . are associated with a defendant's future dangerousness was his race or ethnicity." *See Saldano*, 70 S.W.3d at 884-85. We declined to address the merits of the State's confession that this evidence was erroneously admitted because the defendant "did not make an objection to the testimony as our law has always required." *See Saldano*, 70 S.W.3d at 891.[13] We understand the State to claim that this Court should apply TEX. R. APP. P. 2 to suspend the preservation-of-error-rules contained in TEX. R. APP. P. 33.1 and TEX. R. EVID. 103(a). The State asserts that "rather than argue that Appellant forfeited his right to object to the admission of this evidence on appeal, in the interest of justice and judicial economy, the State acknowledges that the error occurred, that the error was not intentional, and in light of Appellant's sentence of death, he should receive a new trial on punishment."

We find it unnecessary to decide whether Rule 2 can be used to suspend preservation of error rules because we believe that this case is distinguishable from *Saldano*. Appellant had no duty to object because he could not reasonably be expected to have known that the testimony was false at the time that it was made. This case also not only involves the erroneous admission of evidence, as in *Saldano*, but, unlike *Saldano*, it also involves the State's duty to correct "false" testimony whenever it comes to the State's attention. *See Napue v. Illinois*, 360 U.S. 264, 269 (1959) (conviction obtained through perjury, "known to be such by representatives of the State," violates due process, and the same result obtains when the State, although not soliciting perjury, allows it to go uncorrected when it appears); *Carmona*, 185 S.W.3d at 497-98 (Hervey, J., dissenting). In this

---

[13]

Our decision in *Saldano* cited to *Brooks v. State*, which decided that a defendant's failure to object at trial forfeited his appellate claim that testimony was admitted for the sole purpose of appealing to the potential racial prejudices of the jury. *See Saldano*, 70 S.W.3d at 889 n.75 *citing Brooks v. State*, 990 S.W.2d 278, 286 (Tex. Crim. App. 1999).

case, the State has fulfilled this duty to correct the "false" testimony of Merillat that it presented at appellant's trial and which may have contributed to appellant's death sentence. Point of error two is sustained.[14]

Appellant claims in point of error eight that the "police failed to scrupulously honor [his] invocation of the right to remain silent during custodial interrogation." In point of error nine, appellant claims that the "detectives' misleading statements about [his] right to counsel rendered his waiver unknowing, involuntary and unintelligent." And in point of error ten, appellant claims that the "police violated [his] Fifth Amendment and Due Process rights by coercing a confession."

We understand these points to challenge the admission into evidence of appellant's first and second videotaped DVD statements to the police. The record reflects that the trial court held a pretrial hearing on appellant's motion to suppress. At this hearing, the State presented the first DVD statement and the testimony of Detective Greiner. Appellant did not testify at the hearing.

Greiner testified at the suppression hearing that she learned of the murders at about 4:00 p.m. She and another detective went to appellant's apartment at about 8:00 p.m. to question him. While they were in the apartment appellant received a call from his supervisor at the church ("Pastor Roy"), who advised appellant to get a lawyer. Appellant's mother and sister also suggested that appellant get a lawyer. The detectives left the apartment. Appellant followed them out of the apartment alone.

---

[14] Appellant presents an ineffective-assistance-of-counsel claim in point of error three that "[t]rial counsel failed to provide constitutionally-required effective assistance of counsel when she failed to correct the record by introducing the current TDCJ classification policy." The State responds that, based on the record before this Court, "counsel's actions were entirely proper and reasonable" and that "it cannot be said that trial counsel's performance fell below an objective standard of reasonableness, based on prevailing professional norms." Due to our disposition of point of error two, we find it unnecessary to address point of error three.

Appellant expressed some uncertainty about whether he should follow Pastor Roy's advice about getting a lawyer. Greiner informed appellant that getting a lawyer was "his choice," and she also explained that he was "not under arrest" and that he "did not have to talk" to them. Appellant responded that he had nothing to hide and that he wanted to give a statement to the police that night. Appellant decided to ride with the detectives to the police station. When they got into the car, appellant received a phone call on his cell phone from Pastor Roy, who asked appellant to give the phone to Greiner. Greiner took the phone, stepped out of the car and closed the door. Pastor Roy attempted to invoke appellant's rights during this phone call. Greiner told Pastor Roy that, because he was not a lawyer, he could not invoke appellant's rights, and she ended the call.

When they arrived at the police station, appellant was brought to an interview room.[15] Soon after this, appellant made some references to a lawyer.

> [GREINER]: And [Pastor Roy] told you what?
>
> [APPELLANT]: He just told me that he had came [sic] downtown and I said, okay and then he said, he said tell them that you need an attorney.
>
>                  \* \* \*
>
> [GREINER]: Well, exactly, but if you want an attorney, that's your right. You understand that, just like I told you in front of the two officers, if you want an attorney, that's it. I don't talk to you anymore and it--
>
> [APPELLANT]: What's the (inaudible)?
>
> [GREINER]: –it's your choice.
>
> [APPELLANT]: Why do people like ask--to defend me?
>
> [GREINER]: Exactly.

---

[15] The State claims that appellant "was brought in the back to avoid contact with the victim's family and the media." Appellant claims that he was "snuck" into "the back."

[APPELLANT]: Huh-huh.

[GREINER]: But, you know, you told me out there that you had nothing to hide; that you wanted to talk to us--

[APPELLANT]: Yes.

[GREINER]: --so you agreed to come down and talk to us and that's all we're going to do tonight.

Greiner testified that, although appellant was not in custody, she advised him of his *Miranda*/Article 38.22[16] rights because of the prior admonitions by Pastor Roy and appellant's family that appellant should get a lawyer. Greiner testified that appellant indicated to her that he understood and wanted to waive these rights. Greiner testified on cross-examination that appellant did not waive these rights "in those words."

Q. [THE DEFENSE]: Mr. Simpson asked you if you asked [appellant] if he wanted to waive his rights. Did you actually specifically ask him that?

A. [GREINER]: I asked him if he understood his rights.

Q. But you didn't–you never asked him if he was willing to waive his rights?

A. Not in those words, no, sir–no, ma'am.

Q. Did you ever take a written statement that he would have signed that contained a written warning?

A. We did not do that with the DVD. They sign the [rights] card.

Appellant denied any involvement in the murders during approximately three hours of questioning by Greiner. At about this time, Greiner left the interview room and Vargas (appellant's sixteen-year-old girlfriend), who had come to the police station, was allowed to speak with appellant.

---

[16]

*See Miranda v. Arizona*, 384 U.S. 436 (1966); Article 38.22, § 2(a), TEX. CODE CRIM. PROC.

Appellant and Vargas had an emotional encounter when Vargas confronted appellant with information provided to her by the police that appellant told them that he got Sanchez pregnant and murdered her. Appellant told Vargas that he did not tell the police that and that the police lied to her. Vargas accused appellant of lying to her and killing Sanchez. Appellant tearfully continued to deny any involvement in the murders. Vargas left the interview room.

A Detective Walker came into the interview room and began to question appellant. Appellant continued to deny any involvement in the murders but admitted that he had had a sexual relationship with Sanchez. Walker accused appellant of lying about his involvement in Sanchez's murder and also informed appellant that he was the "central figure" in this murder investigation. Walker told appellant that he was free to leave, and appellant acknowledged that he was there voluntarily and did not have to listen to Walker's accusations. Appellant told Walker that he did not want to continue talking and that he wanted the police to give him a ride home.

> [WALKER]: You're done dude. You're done. You got the girl pregnant, she was causing problems for you. I don't know what happened when you went over there today, but something happened. Something went wrong.
>
> [APPELLANT]: No, and you can't even sit here and tell me that I did that. You can't pressure me like that.
>
> [WALKER]: I already did.
>
> [APPELLANT]: No, you can't.
>
> [WALKER]: I just did.
>
> [APPELLANT]: No, cause then I don't have to be here anymore.
>
> [WALKER]: You've never had to be here all along.
>
> [APPELLANT]: I know, I volunteered to come.

[WALKER]: Absolutely.

[APPELLANT]: Okay.

Well, if you're going to sit here and accuse me of doing it, then I don't need to be here anymore.

[WALKER]: No, you don't.  Detective Greiner told you when you got here that you were free to go at any time--

(Interrupting each other)

[APPELLANT]: --

[WALKER]: You came here voluntarily, right?

[APPELLANT]: Yeah, I did.

[WALKER]: Okay.

So, why don't you address some of these things that I'm bringing up.  Why don't you tell me how it happens, that we have witnesses who are putting you at the scene--

[APPELLANT]: I can't tell you that.

[WALKER]: Why can't you tell us why you can't fill in the time gap--

[APPELLANT]: (Inaudible)

[WALKER]: –well, of course, I know why you can't fill in the time gap.

You can't fill in the time gap because you were at [Sanchez's] house.

[APPELLANT]: No.

[WALKER]: Oh, absolutely.

[APPELLANT]: No, I wasn't.

[WALKER]: Yes, you were.

[APPELLANT]: No, I wasn't.

[WALKER]: Yeah you were, and that's exactly (inaudible), the probable cause statement and the –and the arrest warrant will say.

* * *

[APPELLANT]: You can sit here and tell me everything you want to.

[WALKER]: Okay.

[APPELLANT]: That's fine.  I've heard enough from you.

[WALKER]: Okay.

[APPELLANT]: Okay and I'm ready to leave.

[WALKER]: Sir, there's nothing stopping you from leaving.

[APPELLANT]: Okay.

[WALKER]: –you can leave any time you want.

[APPELLANT]: Well, then I'm going to leave right now.

[WALKER]: Listen–are you glued to the chair?

[APPELLANT]: No, I'm just saying.

[WALKER]: Do you want to talk to Detective Greiner before you leave or something; is that what you're staying around for?

[APPELLANT]: No.

[WALKER]: Well--

[APPELLANT]: Well, I don't know, they said they were going to take me home and that's why.

[WALKER]: Oh, no problem.  We'll get you a ride home.

Greiner came into the interview room at this time to tell appellant what Vargas had told her. Appellant told Greiner that she could tell him what Vargas said and that he would then leave.  After Walker left the room, Greiner told appellant that Vargas had told her that Vargas and appellant had

a sexual relationship.

[GREINER]: –finished talking to him–are you done?

[WALKER]: Yeah.  He's wanting to go home.

[GREINER]: Oh, okay.

I was coming in to tell him what [Vargas] had to tell me.

[WALKER]: Okay.

[GREINER]: I'm a little shocked.

(Talking to appellant)

Your choice, do you want me to continue to talk to you?

[APPELLANT]: What is it about?

[GREINER]: Well, what [Vargas] was telling me?

[APPELLANT]: [Vargas]?

[GREINER]: Huh-huh.

[APPELLANT]: That's fine.

[GREINER]: It's your choice, you don't have to talk to me.

[APPELLANT]: That's fine, but after that, I'll leave.

[GREINER]: That's fine.  You can leave right now, in fact, maybe I shouldn't tell him (inaudible).

[WALKER]: Just be careful cause he's already killed one woman today.

(Detective Walker leaves the room.)

[GREINER]: It's your choice, do you want to talk to me?

[APPELLANT]: I just (inaudible) go home.

[GREINER]: You don't want to hear what she has to say?

[APPELLANT]: You mean [Vargas]?

[GREINER]: Huh-huh.

[APPELLANT]: You're going to tell me?

[GREINER]: I'll tell you.

[APPELLANT]: Go ahead.

[GREINER]: I've been honest with you.

[APPELLANT]: That's fine.

[GREINER]: Okay.

She told me some things. I think she was quite upset.

She shared with me that you guys have a sexual relationship.

After talking to appellant for a few minutes about his relationship with Vargas, Greiner asked appellant if he wanted to talk about Sanchez. Appellant replied that he would talk to her for another five minutes and then go.

[GREINER]: I mean, [Sanchez] was an adult.

This is an awful lot, okay?

I'm concerned and my concern is if you want to continue talking to me, that's great, okay, I'll share my concern with you.

With everything they told me–it's your choice, do you want to leave or do you want to keep talking, it's your choice?

[APPELLANT]: Five more minutes, then I'll go.

Less than five minutes later, a tearful appellant confessed that he went to the Sanchez home only to tell Sanchez to leave him alone but that he killed Sanchez after she became angry at him and

attacked him with a knife. Appellant described choking Sanchez to get her to drop the knife and then taking the knife and stabbing her when he realized that choking her was not killing her. Appellant stated:

> [APPELLANT]: And I was just squeezing her neck like that (indicating).
>
> [GREINER]: Yeah.
>
> [APPELLANT]: And she wasn't–she wasn't dying.
>
> [GREINER]: Okay.
>
> [APPELLANT]: And so I got the knife and I don't know how many times I did it, but I did it.

Appellant also told Greiner where he discarded the knife and his shoes and drew her a map. When appellant asked what would happen next, Greiner told him that they would take him home but that a warrant would be issued for his arrest. The entire interrogation lasted approximately five hours. The police took appellant home after taking him to his sister's house to retrieve the shirt that appellant wore during the murders. Appellant was arrested about three hours later pursuant to an arrest warrant. Appellant gave a brief second videotaped DVD statement after being informed of his *Miranda*/Article 38.22 rights, which he indicated that he understood.[17]

The trial court denied appellant's motion to suppress based on the following combined findings of fact and conclusions of law.

1. The first DVD statement made by [appellant] on December 12, 2005, was a

---

[17] In its brief, the State claims that appellant answered "a few additional questions regarding the murder[s]" and that one "of the issues discussed was the location of the evidence he discarded." In his brief, appellant claims that the police "took another brief statement, expanding on some of the tangential details of the first statement." We understand appellant to argue on appeal that the second videotaped statement should be suppressed as the fruit of the first videotaped statement.

voluntary statement. [Appellant] was not under arrest, nor was he in custody at the time of the first interview. It was not the product of undue influence, threats, coercion or promises. The first DVD statement is therefore admissible.

2. While [appellant] was not in custody, the first DVD statement was still taken in compliance with the decision of the United States Supreme Court in *Miranda v. Arizona*. It was also taken in compliance with Article 38.22 of the Texas Code of Criminal Procedure. It was knowingly, intelligently and voluntarily made after [appellant] was given all the legally required warnings by law enforcement personnel who took the statement. While [appellant] did not utilize the word "waiver" in reference to his *Miranda* rights it is clear from the totality of the circumstances that he understood his rights, chose to waive them and continue the interview with law enforcement personnel. The first DVD statement is therefore admissible even if [appellant] could be considered to be in custody at any time during the DVD statement.

3. [Appellant] never unequivocally invoked his right to terminate the interview being conducted on the first DVD. He indicated that he no longer wanted to talk to Detective Curtis Walker, but did want to continue talking to Detective Greiner. Walker exited the interview room and Greiner resumed the interview. The first DVD statement including the portion following Walker's interview is therefore admissible.

The State argues that we should overrule points eight and nine because the evidence supports the trial court's finding that appellant was not in "custody" when the police were questioning him. *See Miranda*, 384 U.S. at 444 (applies only to use of statements obtained from suspect during police-initiated "custodial interrogation"); Article 38.22, § 2 (setting out requirements for admissibility of a defendant's written statement as a result of "custodial interrogation"). Appellant argues that the evidence shows, as a matter of law, that "no reasonable person would feel free to leave after being: 1) transported by the police from his home, where his family was advising him to get an attorney,[18] 2) abruptly cut off from telephone contact with a pastor seeking to protect his rights to counsel, 3)

---

[18] The evidence, however, supports a finding that appellant voluntarily went with the police to the police station after appellant reinitiated contact with the police outside his apartment and stated that he had nothing to hide and wanted to give a statement that night.

read *Miranda* warnings and accused aggressively of murder, 4) told he would stand trial and go to prison, 5) denied his repeated requests to leave,[19] 6) told he did not have to speak with the police, but then subjected to continuing interrogation when he said he did not want to speak with them, and 7) closely guarded at the police station and accompanied by officers to the bathroom."[20]

"In determining whether an individual was in custody, a court must examine all of the circumstances surrounding the interrogation, but the ultimate inquiry is simply whether there [was] a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *See Stansbury v. California*, 511 U.S. 318, 322 (1994) (internal quotes omitted); *Dowthitt v. State*, 931 S.W.2d 244, 254 (Tex. Crim. App. 1996) ("A person is in custody only if, under the circumstances, a[n objectively] reasonable person would believe that his freedom of movement was restrained to the degree associated with a formal arrest.") (internal quotes omitted). An "officer's views concerning the nature of an interrogation, or beliefs concerning the potential culpability of the individual being questioned, may be one among many factors that bear upon the assessment whether that individual was in custody, but only if the officer's views or beliefs were somehow manifested to the individual under interrogation and would have affected how a reasonable person in that position would perceive his or her freedom to leave." *See Stansbury*, 511 U.S. at 325.

We decide that the record supports a finding that appellant was not in custody. We believe

---

[19] We do not believe that the record supports a finding that appellant was "denied his repeated requests to leave." The evidence supports a finding that the police told appellant several times that he was free to leave and even offered him a ride home.

[20] The videotaped DVD indicates that the police escorted appellant to the bathroom **after** he described how he killed Sanchez. This was done apparently to avoid appellant having contact with Sanchez's family.

that this case is similar to *Oregon v. Mathiason* in which the Supreme Court summarily decided on certiorari that the defendant was not in custody when he gave an incriminating statement to the police during questioning at the police station where: 1) the defendant voluntarily came to the police station in response to a request by the police, 2) the police immediately informed the defendant that he was not under arrest, 3) the defendant gave the incriminating statement after a one-half hour interview during which the police falsely stated that his fingerprints were found at the scene, 4) after which the defendant was allowed to leave the police station. *See Oregon v. Mathiason*, 429 U.S. 492, 493-96 (1977). As to the claim that the defendant was in custody because questioning took place in a "coercive environment," the Supreme Court stated:

> Such a noncustodial situation is not converted to one in which *Miranda* applies simply because a reviewing court concludes that, even in the absence of any formal arrest or restraint on freedom of movement, the questioning took place in a "coercive environment." Any interview of one suspected of a crime by a police officer will have coercive aspects to it, simply by virtue of the fact that the police officer is part of a law enforcement system which may ultimately cause the suspect to be charged with a crime. But police officers are not required to administer *Miranda* warnings to everyone whom they question. Nor is the requirement of warnings to be imposed simply because the questioning takes place in the station house, or because the questioned person is one whom the police suspect. *Miranda* warnings are required only where there has been such a restriction on a person's freedom as to render him 'in custody.' It was that sort of coercive environment to which *Miranda* by its terms was made applicable, and to which it is limited.

*See Mathiason*, 429 U.S. at 495.

This case is also similar to *California v. Beheler*, which is another United States Supreme Court case that decided on certiorari that a defendant was not in custody when he voluntarily came to the police station on the day of the offense and gave a statement after brief questioning (less than 30 minutes) and was then allowed to return home. *See California v. Beheler*, 463 U.S. 1121, 1122-25 (1983). We believe that *Mathiason* and *Beheler* support a decision that appellant was not in

custody, even though the interrogation in this case lasted longer (approximately 5 hours) than did the interrogations in *Mathiason* and *Beheler* (approximately 30 minutes). In addition to this, we note that the police told appellant several times that he was free to leave, that appellant also acknowledged that he came to the station voluntarily and did not "have to be [t]here anymore," and that appellant stated several times that he wanted to leave and go home. Under these circumstances, we are unable to conclude that a reasonable person would believe that he was not free to leave. *See Dowthitt*, 931 S.W.2d at 254; *State v. Carroll*, 645 A.2d 82, 88 (N.H. 1994) (defendant's statement that he "want[ed] to go home" suggests "that the defendant himself believed that he could have left if he so chose"). This record supports a finding that appellant could have simply walked out of the police station at any time (and, in this case, asked the police for a ride home at any time). In fact, that is exactly what he did after he gave his statement. That the interrogation may have taken place in what appellant characterizes as a "coercive environment" does not require a contrary decision. *See Mathiason*, 429 U.S. at 495 ("Any interview of one suspected of a crime will have coercive aspects to it, simply by virtue of the fact that the police officer is part of a law enforcement system which may ultimately cause the suspect to be charged with a crime."). The record supports the trial court's finding that appellant was not in custody when he provided the first videotaped DVD statement to the police. This resolves appellant's claims that the police failed to scrupulously honor his invocation of his right to silence and that any waiver of his right to counsel was "unknowing, involuntary and unintelligent."[21] Points of error eight and nine are overruled.

---

[21] We understand appellant to argue in his reply brief that it is irrelevant that he subjectively believed that he was free to leave because the legal test for custody is an objective one. *See Dowthitt*, 931 S.W.2d at 254. We disagree and believe that it is relevant to the legal test for custody that the record reflects that a suspect, who has reinitiated contact with the police, subjectively

Appellant also claims in point of error ten that the police coerced his confession primarily because the police continued to interrogate appellant after he invoked his *Miranda* rights to counsel and to remain silent after the police had informed him of these rights.[22]  In support of this claim, appellant relies on the following *dicta* from a Tenth Circuit decision in *United States v. Bautista* stating:

> Finally, we address the government's assertion that it makes no difference that Agent Leggitt unnecessarily advised Bautista of his *Miranda* rights when Bautista was not in custody.  The government's position misses the point of *Miranda* and *Edwards* [*v. Arizona*, 451 U.S. 477 (1981)].  If the authorities are free to tell a suspect that he has the right to appointed counsel, but could, while continuing to interrogate him, refuse to provide such counsel on the grounds that the suspect was not actually in custody, the suspect would be led to believe that no request for counsel would be honored. "The coercive effect of continued interrogation would thus be greatly increased because the suspect would believe that the police 'promises' to provide the suspect's constitutional rights were untrustworthy, and that the police would continue to violate those rights as they wished, regardless of assurances to the contrary."

*See United States v. Bautista*, 145 F.3d 1140, 1150-51 (10th Cir. 1998) (quoting *Tukes v. Dugger*, 911 F.2d 508, 516 n.11 (11th Cir. 1990)).

Even if we were to assume that appellant unambiguously invoked his rights to counsel and to silence during the noncustodial interrogation setting,[23] we do not agree that the police were

---

believes that he is free to leave while the police are questioning him.  This together with the other circumstances can be relevant to the custody determination and whether an objectively "reasonable person would believe that his freedom of movement was restrained to the degree associated with a formal arrest." *See id.*

[22] Appellant also claims that his confession was coerced because (1) he "was 22 years of age and had never before been arrested," (2) the police may have misled appellant into thinking that his actions could have been justified, (3) appellant maintained his innocence during four hours of interrogation, and (4) appellant "was exposed to the emotional turmoil of [Vargas] accusing him of impregnating [Sanchez] and killing her before he [confessed], resulting in [appellant] crying."

[23] *See Dowthitt*, 931 S.W.2d at 257 (officer need not stop [custodial] questioning "unless the suspect's invocation of rights is unambiguous, and the officer is not required to clarify ambiguous

required to honor these invocations. We adopt the following discussion from our unpublished

decision in *Davis v. State*:

> Because the appellant was not in custody, law enforcement officials had no obligation under *Miranda* to scrupulously honor a request to terminate questioning. Although *Miranda* warnings were given (unnecessarily), that fact does not change the analysis. We have recognized that the prosecution cannot impeach a defendant with his post-*Miranda* silence, even if *Miranda* warnings were given prematurely.[24] This recognition was based on the idea that it is fundamentally unfair to make the implicit promise that silence will carry no penalty and then to break that promise by using the defendant's silence against him at trial. The scrupulous honoring of rights, however, presents a different situation. The need to scrupulously honor a defendant's invocation of *Miranda* rights does not arise until created by the pressures of custodial interrogation. Without those pressures, the police are free to attempt to persuade a reluctant suspect to talk, and the immediate termination of the interrogation after the invocation of rights is simply not required.[25]

*See Davis v. State*, slip op. at 11 (Tex. Crim. App. No. AP-74,393, delivered June 13, 2007) (Womack, J., joined by Price, Johnson, Holcomb, and Cochran, JJ.) (not designated for publication) (footnotes omitted).[26]

---

remarks").

[24] We note that this case does not present a situation in which the prosecution urged the jury to infer appellant's guilt from any invocation by appellant of his rights to counsel and to silence.

[25] *See also Oregon v. Elstad*, 470 U.S. 298, 305 (1985) (voluntary statements "remain a proper element in law enforcement" and "far from being prohibited by the Constitution, admissions of guilt by wrongdoers, if not coerced, are inherently desirable") (internal quotes omitted).

[26] We believe that the defendant's remedy in a noncustodial setting where the police continue questioning the defendant after the defendant has unambiguously invoked his right to silence is simply to get up and leave as appellant could have done in this case. *See also Commonwealth v. Morgan*, 610 A.2d 1013, 1020 (Pa. Super. Ct. 1992) (interrogating officer's "hostile" tone during noncustodial interrogation was not, by itself, constitutionally cognizable coercion given the fact that the defendant, "by her own admission, could have avoided such a presumably undesirable tone simply by walking out the same door of the police station through which she had voluntarily entered only a short time earlier"). We further note that accepting appellant's suggestion that the police should have cut off questioning if appellant invoked his right to silence after gratuitously receiving *Miranda* warnings would deter police from informing a suspect of his rights during noncustodial

We also decide that the interrogation techniques employed in this case are not the type of brutal "third-degree" techniques that would render a defendant's "statements to have been involuntary in traditional terms." *See Miranda*, 384 U.S. at 455-57; *State v. Terrazas*, 4 S.W.3d 720, 723-24 (Tex. Crim. App. 1999) (voluntariness test is whether "the confession is the product of an essentially free and unconstrained choice by its maker" and whether the confession is true or false is irrelevant to a voluntariness determination because "it is the methods used to extract an involuntary confession that offends constitutional principles") (internal quotes omitted) and at 726-27 (discussing examples of interrogation methods that offend constitutional principles); *Carroll*, 645 A.2d at 83-87 (deciding under New Hampshire Constitution, which "provides greater protection to a criminal defendant with respect to the voluntariness of confessions than does the Federal Constitution," that defendant's confession was voluntary where two officers testified that the approximately two-hour-long noncustodial interrogation "was one of the most emotional and intense interrogations they had ever witnessed" which included raised voices and a tearful defendant saying "I just want to go home"). We cannot conclude that appellant's videotaped DVD statement was coerced and involuntary as a matter of federal constitutional law. Point of error ten is overruled.

In point of error eleven, appellant claims that the "trial court committed reversible error by

---

interrogation. *See Morgan*, 610 A.2d at 1019 ("First, there is nothing inherently coercive about the fact that the officer warned [the defendant] of her right to remain silent, of the fact that what she said could be used against her, of her right to cut off questioning whenever she chose to, or of her right to an attorney. The decision to gratuitously apprise [the defendant] of her *Miranda* rights in situations such as this, where the law did not require that such advice be offered, should be applauded, not deterred. This fact suggests that the police officer acted with an abundance of caution to insure that no answer be given without the benefit of a relevant legal education. To find fault with this would surely inhibit such spontaneous tutelage. Neither law nor logic would compel us to do so."). We decline appellant's invitation to put the interrogating officers in this case in a worse position than they would have been in had they provided no *Miranda* warnings at all.

admitting Appellant's [videotaped DVD statement] in violation of Article 38.22 § 6 and 38.21."

Appellant argues that, even if he were not in custody, this statement was involuntary, as a matter of state law, because the police told him that he had a right to remain silent but then continued questioning him after he invoked that right. Appellant also claims that it is relevant to this voluntariness determination that he was "22 years of age and with no experience in the criminal justice system."

This case does not present the type of fact scenario that raises a state-law claim of involuntariness. *See Oursbourn v. State*, 259 S.W.3d 159, 172-73 (Tex. Crim. App. 2008) ("Under Articles 38.21 and 38.22 and their predecessors, fact scenarios that can raise a state-law claim of involuntariness (even though they do not raise a federal constitutional claim) include the following: (1) the suspect was ill and on medication and that fact may have rendered his confession involuntary; (2) the suspect was mentally retarded and may not have 'knowingly, intelligently and voluntarily' waived his rights; (3) the suspect 'lacked the mental capacity to understand his rights'; (4) the suspect was intoxicated, and he 'did not know what he was signing and thought it was an accident report'; (5) the suspect was confronted by the brother-in-law of his murder victim and beaten; (6) the suspect was returned to the store he broke into 'for questioning by several persons armed 'with six-shooters.'") (footnotes omitted). In this case, for example, the record supports findings that appellant understood his rights and understood that he was free to leave at any time during the police interrogation. Point of error eleven is overruled.

In point of error twelve, appellant claims that the "trial court committed reversible error by admitting Appellant's [videotaped DVD statement] in violation of Article 38.22 §§ 2-3." These provisions, however, apply to the admission of written or oral statements "as a result of custodial

interrogation." *See also Oursbourn*, 259 S.W.3d at 172.  In this case, the record supports the trial court's finding that appellant's statements were not the result of custodial interrogation.  Point of error twelve is overruled.

In point of error thirteen, appellant claims that the trial court denied him "a fair trial by failing to instruct the jury on voluntariness and the attendant *Miranda* issue."  We understand appellant to claim that he should have received these jury instructions with respect to his first DVD videotaped statement.  The record reflects that appellant requested only a "38.23" charge on whether he was in custody and on whether he invoked his right to terminate the interrogation.

> [THE DEFENSE]: Then the next one is 38.23 on the statement, on the voluntariness of the statement.  Just the–you know, the termination–I mean, you know, it's out there, it's a jury issue.  You-all–she says that–I personally believe that he did enough to terminate that statement and Greiner said that he wanted to continue talking to her.  But he was very clear in the DVD.  He wanted to continue talking about whatever Vargas had just said, "and then I'll go home," he said on the DVD.  I certainly think there is enough.  The custodial issue, certainly the waiver issue I think is there for me to get a 38.23 charge.

The record also reflects that the defense stated that it had no objections to the jury charge and that the defense may even have drafted the Article 38.23 charge that was submitted to the jury.  This "general" charge stated:

> You are instructed that under our law that no evidence obtained by an officer or other person in violation of any provisions of the Constitution or laws of the State of Texas, or the Constitution or laws of the United States of America, shall be admitted in evidence against the accused on the trial of any criminal case.

> Therefore, if you believe or have a reasonable doubt that the evidence was obtained in violation of any provisions of the Constitution or laws of the State of Texas, or of the Constitution or laws of the United States of America, in such event, the jury shall disregard any such evidence so obtained.

The record further reflects that the defense never argued to the jury that appellant's DVD

videotaped statement was illegally obtained and, therefore, should have been disregarded. The

record also reflects that the defense relied on portions of appellant's videotaped DVD statement to

show "some of the feelings that [appellant] was having."

> [THE DEFENSE]: And just some other things on the DVD to show some of the feelings that [appellant] was having. When Greiner left at the end of the first statement, not the second one where he came in in handcuffs, when–it's very clear from the beginning of the DVD that Detective Greiner did not, you know, inform [appellant] that he was being orally or–or recorded video. There's a sign up there in the police department, but that doesn't mean he saw it.
>
> After she left the room, and I don't think it was long before [one of appellant's lawyers] turned off the video recorder because we didn't want you to sit here and watch dead air, but he sat there and he cried and he sobbed and he sobbed. I mean, there were true feelings coming out from him. And he wasn't doing it for show, because he didn't know that anybody was watching him.[27]

We understand appellant to argue on appeal that the trial court should have also provided an

Article 38.22, § 7 voluntariness instruction and another instruction to disregard his videotaped DVD

statement if appellant did not validly waive his *Miranda* rights. Appellant argues:

---

[27]
Before this, the State, apparently anticipating that appellant would challenge the legality of his videotaped DVD statement, argued:

> [STATE]: The other thing the defense is going to talk to you about, they are going to say, "You know what? That confession was obtained illegally by the police, and you should just ignore everything that's in it." They are going to say because [appellant] did not say the magic words, "I waive my rights," that somehow he was involuntarily pushed into giving that confession. That's the standard, voluntariness. But you will look in that charge, there's not a single word in there that says the defendant has to say the magic words, "I waive my rights." It is a totality of the circumstances. And you watch Detective Greiner ask him, "Are you sure you want to talk to me? You're not under arrest. I'm going to read you your rights, just so–just in case–just like Pastor Roy told you, you should get an attorney. But you're saying you don't want an attorney, but you have that right to have an attorney. Are you sure? Are you sure? Are you sure?
>
> What did he say? "I'm sure. I'm here voluntarily."

Article 38.22, § 7 states that trial judges "**shall**" instruct the jury that the prosecution must prove beyond a reasonable doubt that the defendant knowingly, voluntarily, and intelligently waived his *Miranda* rights, if the issue is raised by the evidence. Similarly, whether requested or not, a voluntariness instruction under Article 38.22 § 6 is also required "where a question is raised." Here, where the evidence raised questions about the voluntariness of [appellant's] statement and about the legality of his *Miranda* waiver, and where the trial judge held hearings and made findings with respect to each of these issues, these sections of 38.22 constitute the "law applicable to this case." Thus, the instructions under these sections were mandatory. Reversal is required because the trial court failed to instruct the jury on voluntariness and the *Miranda* issue, and prejudice ensued.

(Citations to authority and to the record omitted, emphasis in original).

The record reflects that appellant did not request these instructions at trial. Therefore, in order to obtain a reversal of his conviction for the trial court's failure to *sua sponte* provide these instructions, appellant must show that they are "law applicable to the case" and that he was "egregiously harmed" by their absence. *See Oursbourn*, 259 S.W.3d at 174-76; *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985) (op. on reh'g). Assuming that appellant offered "evidence before the jury suggesting that the confession was not in fact voluntary,"[28] we decide that appellant was not entitled to an Article 38.22, § 6 voluntariness instruction because no "reasonable jury could find that the facts, disputed or undisputed, rendered him unable to make a voluntary statement." *See Oursbourn*, 259 S.W.3d at 176. The record contains no fact scenario that raises a "state-law claim of involuntariness" or that raises a federal constitutional (police-coercion) claim of involuntariness. *See Oursbourn*, 259 S.W.3d at 172-73 (describing fact scenarios that raise these state-law and federal constitutional claims). We also decide that appellant was not entitled to an

---

[28] *See Oursbourn*, 259 S.W.3d at 175 (one of the "sequence of events that seems to be contemplated by Section 6" is that "a party may offer evidence before a jury suggesting that the confession was not in fact voluntary").

Article 38.22, § 7 (validity of *Miranda* waiver) instruction because the undisputed evidence shows that appellant was not in custody and was not entitled to be informed of these Miranda rights that the police nevertheless provided to him anyway and that the totality of the circumstances indicate that appellant knowingly waived. *See Oursbourn*, 259 S.W.3d at 176; *see also Berghuis v. Thompkins*, No. 08-1470, slip op. at 12 (United States Supreme Court, June 1, 2010) (prosecution does not need to show that a waiver of *Miranda* rights was express); *Joseph v. State*, 309 S.W.3d 20, 24-26 (Tex. Crim. App. 2010) (in absence of express and explicit waiver of *Miranda* rights, totality of circumstances may show voluntary waiver of these rights) and at 29 (Cochran, J., concurring) ("Under some circumstances, if a suspect has been fully warned of his rights and has indicated that he understands those rights, a course of conduct consistent with waiver 'may' support the conclusion that the suspect has waived his *Miranda* rights.").

In point of error fourteen, appellant claims that the "State's unnecessary introduction of an inflammatory and repetitive 911 recording of Sanchez's family members upon discovering her body denied appellant a fair trial" at the guilt stage and at the sentencing stage. At trial, appellant claimed, among other things, that the 9-1-1 recording was "extremely prejudicial." Appellant claims on appeal that the approximately seven-minute 9-1-1 recording was "charged with emotion" and was "grossly prejudicial and inflammatory" because: 1) "family members can be heard screaming and crying uncontrollably about the victim's bloody body," 2) there are "screams that the father of the victim is 'going crazy,'" 3) there are "unintelligible screaming and weeping by several people in the background," and 4) there are "emphatic appeals to family members to attempt to administer first aid." Appellant further complains that "[m]ost of the recording relates to attempts by one of [Sanchez's] relatives to administer first aid."

We have held that evidence such as this is admissible at the guilt phase to "provide a framework within which the particulars of the State's evidence could be developed" even though the evidence "did not of itself establish any material fact not otherwise proven in the balance of the State's case." *See Webb v. State*, 760 S.W.2d 263, 276 (Tex. Crim. App. 1988). Point of error fourteen is overruled.

In point of error fifteen, appellant claims that the "State's unnecessary introduction of gruesome fetal autopsy photographs denied appellant a fair trial." Appellant complains of the admission into evidence of State's Exhibits 73, 74, and 75. State's Exhibit 73 is a picture of Sanchez' uterus with the embryonic sac holding the unborn child. State's Exhibit 74 is an enlarged photograph showing the unborn child through the embryonic sac. State's Exhibit 75 is another photograph showing the unborn child through the embryonic sac with an L-ruler measuring the size of the embryonic sac. State's Exhibits 74 and 75 appear almost identical except for the L-ruler measuring the embryonic sac in State's Exhibit 75.

The record reflects that, before the medical examiner testified, the trial court held a hearing outside the jury's presence on the admissibility of these exhibits.

> [DEFENSE LAWYER #1]: Those fetus pictures, I know I have an objection to those fetus pictures.
>
> [DEFENSE LAWYER #2]: I thought one was repetitive.
>
> [THE STATE]: There's another one they want to object to, too, Judge.
>
> [DEFENSE LAWYER #2]: The one underneath.
>
> [THE STATE]: You want the one without the ruler [State's Exhibit 74] out?
>
> [DEFENSE LAWYER #1]: Yes.

[THE STATE]: You need the one with the ruler [State's Exhibit 75].

[DEFENSE LAWYER #1]: I would like to have the one without the ruler, not–I would like to object to that because it's not representative of the actual size. At least with the ruler there, they may have some idea of the actual–because that's a blown up picture size of the fetus. And I think that's pretty prejudicial because it doesn't really represent the size of the fetus.

[TRIAL COURT]: Okay. 74?

[THE STATE]: I mean, our response to that, Judge, is that one of the things that the medical examiner's going to testify to is that there's clear amniotic fluid and no sign that the baby–the baby has any difficulties, and it's not as easy to see in that other picture that shows the size. It's easier for her to talk about it in the bigger picture.

[DEFENSE LAWYER #1]: Well, and, Judge, I'm not really sure how relevant that testimony is from the ME with respect to that because that's almost like they are trying to counter a possible jury nullification argument on our part as far as the prior miscarriage and things. I mean, clearly, at the time that the baby was killed, the baby was, you know, a healthy fetus at that point. So I would--

[THE STATE]: Well, we do have to prove that the baby was alive at the time of death, Judge.

[DEFENSE LAWYER #1]: That's true.

[TRIAL COURT]: Okay. So, I guess, did you want to get her on the stand?

[THE STATE]: Yes, Judge. I'll get her on the stand.

[TRIAL COURT]: I'm going to overrule the objection to Exhibit 74, it will be admitted.

At this point, the parties went on to address the admissibility of Sanchez's autopsy photographs. The record thus reflects that, even though appellant may have objected to all three exhibits depicting the unborn child, appellant obtained a ruling from the trial court only to the admissibility of one of the exhibits--State's Exhibit 74. *See* Tex. R. App. P. 33.1(a)(2)(A) (a prerequisite for presenting a complaint for appellate review is to present a record showing that the

trial court ruled on a party's objection). This preserved error only to the admissibility of State's Exhibit 74. *See id*.

The record further reflects that, while the medical examiner was later testifying before the jury, appellant stated that he had "no objection" when all three exhibits, including State's Exhibit 74, were offered and then admitted into evidence.

> [THE STATE]: At this point, Your Honor, I'll offer State's Exhibits 63, 64, and then 66 through 75 to defense counsel pending any objection.
>
> (Evidence offered as State's Exhibits 63, 64, and 66 through 75.)
>
> [THE DEFENSE]: No objection.
>
> [TRIAL COURT]: They are admitted.
>
> (Evidence admitted as State's Exhibits 63, 64, and 66 through 75.)

We decide that appellant failed to preserve any error in the admission into evidence of State's Exhibits 73, 74, and 75 when defense counsel stated "no objection" to the admission of this evidence. *See Holmes v. State*, 248 S.W.3d 194, 196 (Tex. Crim. App. 2008) (a defendant who affirmatively states, "No objection," when evidence is offered waives his right to complain on appeal that the evidence was illegally obtained under Article 38.23); *Gearing v. State*, 685 S.W.2d 326, 329 (Tex. Crim. App. 1985) ("It is settled that when a pre-trial motion to suppress evidence is overruled, the accused need not subsequently object to the admission of the same evidence at trial in order to preserve error. However, when the accused affirmatively asserts during trial he has 'no objection' to the admission of the complained of evidence, he waives any error in the admission of the evidence despite the pre-trial ruling.") (citation to authorities omitted); *see also Leday v. State*, 983 S.W.2d 713, 718 (Tex. Crim. App. 1998) (Texas rule that requires objection to every offer is sometimes

called "the 'futility rule'; that is, despite ruling of judge that evidence is admissible, party must keep making futile objections on pain of waiver").[29]  Point of error fifteen is overruled.

In point of error sixteen, appellant complains that the State's failure to redact references to Vargas' age in appellant's videotaped DVD statement denied him a fair trial.  Appellant did not object or ask for an instruction to disregard when this evidence was admitted.  This complaint, therefore, was not preserved for appellate review.[30]  *See Young v. State*, 137 S.W.3d 65, 69-70 (Tex. Crim. App. 2004) (objection required to preserve error to any foreseeable occurrence, and request for instruction to disregard or motion for mistrial required to preserve error to unforeseeable occurrence).  Point of error sixteen is overruled.

In point of error seventeen, appellant claims that the State deprived him "of a fair trial through repeated misconduct in opening and closing statements at the guilt-innocence phase." Appellant complains that the State speculated that appellant may have murdered Sanchez because

---

[29]

We further note that any preserved error in the admission of State's Exhibit 74 was harmless in light of the proper admission into evidence of very similar State's Exhibits 73 and 75. *Cf. Leday*, 983 S.W.2d at 716-18 (improper admission of evidence is harmless when other such evidence is admitted without objection).

[30]

The record reflects that the State agreed to redact references to Vargas' age in appellant's DVD videotaped statement.  The record also reflects that the State unintentionally failed to redact a reference to Vargas' age and that appellant strategically did not object or ask for an instruction to disregard:

> [THE DEFENSE]: Now, my problem is, if I object to it and ask you to instruct the jury to disregard, I focus their attention on to it.  I'm not sure how much of that they saw.  If I don't ask you to do that, I've waived it.
> * * *
> So what we're going to do is, I don't want –I'm not going to ask for an instruction to disregard, even though that waives the error, because I don't really want to focus the jury in on it in case they didn't notice it.

she refused to get another abortion. Appellant also complains of the State's reference to Sanchez's prior abortion as evidence that appellant knowingly killed the unborn child in this case. Appellant also complains of the State's reference on how Sanchez may have felt as appellant was murdering her. Appellant further complains of the State's reference to the stab wounds in Sanchez's neck being for Sanchez while the other stab wounds were for the unborn child. Appellant also complains about the State's reference to victim-impact evidence such as the "dreams and hopes of a 17-year-old mother to be." Appellant also claims that the State's references to appellant not mentioning during the police interrogation that he did not mean to kill Sanchez or the unborn child impermissibly shifted the burden of proof to the defense and were comments on appellant's failure to testify. Appellant also claims that the State misstated the law when it argued that the jury should not consider self-defense because "evidence of defensive acts in excess of that needed for self defense can support a conviction for the lesser-included offense of manslaughter." Appellant also complains that the "State's summation completely mischaracterized Appellant's lack-of-intent defense as a self defense claim." And appellant also claims that the State "intimidated the jury" by "claiming that it would be a crime to return a verdict of anything but capital murder." Appellant claims that these arguments "inflamed the jury's passions and prejudices, attacked constitutionally protected activity and relied on blatant speculation, improper and irrelevant victim impact evidence, burden shifting, mischaracterizations of the law and defense theory of the case, and usurpation of the jury's role."

Appellant asserts that "although the defense did not properly object to the prosecutor's repeated instances of prosecutorial misconduct, these errors are preserved for appellate review because the prosecution's argument was so egregious that no instruction to disregard could possibly cure the harm." As support for this proposition, appellant cites to our decision in *Willis v. State*, 785

S.W.2d 378, 385 (Tex. Crim. App. 1989). We overruled the exception discussed in *Willis* more than ten years ago. *See Cockrell v. State*, 933 S.W.2d 73, 89 (Tex. Crim. App. 1996) (holding a "defendant's failure to object to a jury argument . . . forfeits his right to complain about the argument on appeal."). Moreover, assuming, as appellant argues, that "the prosecution's argument was so egregious that no instruction to disregard could possibly [have] cure[d] the harm," then appellant should have moved for a mistrial to preserve this error. *See Young*, 137 S.W.3d at 70. Point of error seventeen is overruled.

In point of error eighteen, appellant claims that the trial court denied him "a fair trial by failing to include in the jury charge the statutory definition of 'death' of an unborn child." This statutory definition states, "'Death'" includes, for an individual who is an unborn child, the failure to be born alive." *See* § 1.07(a)(49), TEX. PEN. CODE. Appellant claims that he was "egregiously harmed" by the trial court's failure to *sua sponte* instruct the jury on this statutory definition that appellant failed to request. *See Almanza*, 686 S.W.2d at 171. We understand appellant to argue that he was "egregiously harmed" because the State argued that appellant "knowingly or intentionally causing the death of the pregnant woman would suffice to establish that he knowingly or intentionally caused the death of the fetus."[31] The record does not support this assertion. The record

---

[31]
We note that the jury charge did not contain a "transferred intent" instruction. *See generally Roberts v. State*, 273 S.W.3d 322 (Tex. Crim. App. 2008). The jury charge also did not instruct the jury that appellant knowingly or intentionally causing Sanchez's death "would suffice to establish that he knowingly or intentionally caused the death of the fetus." The jury charge provided:

Now, if you find from the evidence beyond a reasonable doubt that on or about the 12th day of December, 2005, in Bexar County, Texas, the defendant, Adrian Estrada, did intentionally or knowingly cause the death of an individual, namely, Stephanie Sanchez, by cutting or stabbing the complainant with a deadly weapon, namely, a knife, that in the manner of its use or intended use was capable of causing death or

reflects that the State argued, consistent with the allegations in the indictment and in the jury charge, that appellant knew that Sanchez was pregnant and that he knew that killing her would also cause the death of the unborn child.

> [STATE]: So let's talk about the crux of this case. They are saying he did not knowingly kill the baby. Actually, they are not saying that, are they? They keep saying intent, it's his intent, his intent, intent. They skipped over a whole mental state, didn't they?
>
> They say–they talk about intentionally or reckless disregard.[32] They don't want to talk about knowingly, but that's in the charge. We have to prove either intentionally or knowingly.
>
> * * *
>
> He knew [Sanchez] was pregnant. It might be a different–it's certainly a different case if it's unclear as to whether the Defendant knew she was pregnant. If it's just a stranger killing somebody who is pregnant–it's not like she was showing, okay? That's a different case. But that's not this case. Notice, he knew she was pregnant. Knew. Knowingly. Know what happens. You-all know what know means, when you know something.
>
> Dr. Beceiro, Dr. Molina said the baby can't live without mom. And, once again, the defense said, well, why are they bringing that? Well, because we have to prove that the baby was–had not–was not like a dead fetus in her womb. Right? And we proved that to you by the growth. You know the baby was still alive and doing well. It's not to inflame you. It's to let you know the facts. Aren't you entitled to hear the facts as a jury, to know what happened.
>
> He knew the baby would die, folks. He knew it.

On this record, we do not see how appellant could possibly have been harmed by the trial

---

serious bodily injury, and Adrian Estrada did intentionally or knowingly cause the death of another individual, namely, an Unborn Child, by cutting or stabbing the complainant with a deadly weapon, namely, a knife, that in the manner of its use or intended use was capable of causing death or serious bodily injury, and both murders were committed during the same criminal transaction, then you will find the defendant guilty of capital murder as charged in the indictment.

[32] The record reflects that appellant received a lesser-included-offense instruction on murder as to Sanchez and a lesser-included-offense instruction on manslaughter as to the unborn child.

court's failure to *sua sponte* instruct the jury that the unborn child's death was "the failure to be born alive." Point of error eighteen is overruled

In point of error nineteen, appellant claims that without "evidence that appellant knowingly or intentionally killed the fetus, the conviction lacks support by legally and factually sufficient evidence and violates due process." *See Watson v. State*, 204 S.W.3d 404, 415 (Tex. Crim. App. 2006) (discussing difference between legal and factual-sufficiency review). Consistent with the applicable statute,[33] the jury charge provided that a "person acts knowingly, or with knowledge, with respect to a result of his conduct when he is aware that his conduct is reasonably certain to cause the result." Viewed in a "neutral light" and in the light most favorable to the verdict, the evidence is sufficient to support a finding that appellant knew that Sanchez was pregnant. A jury could reasonably infer from this evidence that appellant was aware that strangling a pregnant woman and stabbing her thirteen times with a knife was reasonably certain to cause the unborn child's death. Point of error nineteen is overruled.

In point of error twenty, appellant claims that the trial court erred to deny his motion to dismiss the prosecution or to recuse the prosecutor's office from prosecuting the case because the prosecution violated appellant's Sixth Amendment right to counsel by "purposefully intruding into [appellant's] attorney-client relationship." The record reflects that the State came into possession of a brown bag of documents that were removed from appellant's jail cell during an administrative search. It appears that some of these documents were protected by the attorney-client privilege and that one of the prosecutors in the case probably read at least one of the privileged documents that,

---

[33] *See* § 6.04(b), TEX. PEN. CODE, (defining culpable mental state of "knowingly").

pursuant to instructions by his lawyer, appellant drafted regarding his relationship with Sanchez.[34]

This prosecutor testified that she did not discover anything in these materials that was not already

known to her.

> Q. [STATE]: Was there anything in what you discovered that had information that you did not already know from–or anything different from what the Defendant's confession said in his DVD?
>
> A. [MELTON]: No, there was nothing that I thought added a new fact at all. There were things that discussed material that was already in his confession or his second statement or that we had already had developed by the police investigation.
>
> Q. So was there anything that you read that in any way gave you an insight as to the Defendant's defense or things that he was talking with his attorneys that would help his defense out?
>
> A. No. The things that I marked in the bag were things really that primarily had to do with the Defendant's personal writings, writings that he was writing to friends and to [Vargas], who is another underage female victim in this case, not things that had to do with his defensive issues in regard to this murder.

We decide that the record supports a finding that appellant suffered no prejudice from any

intrusion by the prosecutor into appellant's attorney-client relationship. *See Murphy v. State*, 112

S.W.3d 592, 602-03 (Tex. Crim. App. 2003) (evidence showed no prejudice to defendant when

prosecutor, who reviewed privileged materials seized from the defendant's jail cell, "testified that

he did not use any of the information in the three pages of material in preparing the case"). Point

of error twenty is overruled.

In points of error twenty-four through twenty-eight, appellant presents what he characterizes

as "instructional errors at sentencing." These points, however, are really facial constitutional

---

34

Appellant claims that the State's conduct was purposeful. The State presented evidence that would support a finding that it inadvertently came into possession of these privileged materials.

challenges to various portions of Article 37.071. The record, however, reflects that appellant did not preserve these claims for appeal. *See Karenev v. State*, 281 S.W.3d 428, 434 (Tex. Crim. App. 2009) (defendant may not raise for first time on appeal a facial challenge to constitutionality of a statute).

And, even if appellant preserved these claims, they are without merit. In point of error twenty-four, appellant claims that "the jury instructions violated [appellant's] constitutional rights by impermissibly interfering with the jurors' ability to consider and give effect to mitigating evidence and by coercing the jury into reaching a verdict." Appellant also claims in point of error twenty-four-A that the "misleading jury instructions in this case impermissibly interfered with the jurors' ability to consider and give effect to mitigation." In this point of error, appellant challenges the constitutionality of the "10-12" rule. This Court has rejected constitutional challenges to this rule. *See Escamilla v. State*, 143 S.W.3d 814, 828 (Tex. Crim. App. 2004). Point of error twenty-four is overruled.[35]

In point of error twenty-five, appellant claims that the "trial court committed reversible error by charging the jurors that they had discretion to decide whether a circumstance was mitigating." Appellant claims that this instruction and Article 37.071, § (2)(f)(4), TEX. CODE CRIM. PROC., which authorizes this instruction, "violate the Eighth Amendment because the jury is **not** entitled to decide whether proffered evidence is, in fact, mitigating" (emphasis in original). This Court has rejected this claim. *See Threadgill v. State*, 146 S.W.3d 654, 671 (Tex. Crim. App. 2004). Point of error twenty-five is overruled.

---

[35] In this point of error, appellant also challenges the trial court's response to the jury notes discussed in point of error two. Assuming that this claim is preserved, we find it unnecessary to address this claim in light of our disposition of point of error two.

In point of error twenty-six, appellant claims that the "trial court committed reversible error by statutorily charging the jury on special issue one (i.e., future dangerousness)" because the term "probability" in it diluted the State's beyond-a-reasonable-doubt burden of proof standard. This Court has rejected this claim. *See Rayford v. State*, 125 S.W.3d 521, 534 (Tex. Crim. App. 2003). Point of error twenty-six is overruled.

In point of error twenty-seven, appellant claims that "[a]pplying an unconstitutional statute, the trial court's instruction presuming a death sentence constituted reversible error." Appellant claims that the mitigation special issue in Article 37.071, § 2(e)(1), TEX. CODE CRIM. PROC., unconstitutionally creates a "presumption of death." This Court has rejected this claim. *See Russeau v. State*, 291 S.W.3d 426, 436 (Tex. Crim. App. 2009). Point of error twenty-seven is overruled.

In point of error twenty-eight, appellant claims that "[a]pplying an unconstitutional statute, the trial court committed reversible error by instructing the jury to consider mitigating evidence in its future danger decision." Appellant argues that the jury instruction required by Article 37.071, § 2(d)(1), TEX. CODE CRIM. PROC., is unconstitutional because it requires a jury, in answering the future-dangerousness special issue, to consider "evidence of the defendant's background or character or the circumstances of the offense that militates for or mitigates against the imposition of the death penalty." Appellant argues that, because the "future dangerousness issue is distinct from the mitigation issue" and because "not all mitigating evidence bears on future dangerousness," the foregoing instruction "injected confusion and the strong possibility that the jury factored any perceived lack of mitigation evidence into its future danger inquiry."

We are not persuaded that this rather straightforward instruction that instructs the jury to consider mitigating evidence in answering the future-dangerousness special issue "injected confusion

and the strong possibility that the jury factored any perceived lack of mitigation evidence into its future danger inquiry." We further note that we have rejected what we believe to be similar, though not identical, challenges to the instruction required by Article 37.071, § 2(d)(1). *See Russeau*, 291 S.W.3d at 435 (rejecting claim that Article 37.071, § 2(d)(1) instruction unconstitutionally failed "to instruct the jury so as to limit the scope of militating evidence in favor of death to that which a juror might regard as increasing a defendant's moral blameworthiness") (internal quotes omitted); *Scheanette*, 144 S.W.3d at 508 ("affirmative finding on future dangerousness question does not necessarily compel a negative answer on the mitigation question"). Point of error twenty-eight is overruled.

In point of error thirty-two, appellant claims that his death sentence should be reformed to life because the "trial court committed reversible error by denying appellant's written and oral objections to the court's charge and verdict form on the ground that the indictment did not allege special issue one." This Court has rejected this claim. *See Roberts v. State*, 220 S.W.3d 521, 535 (Tex. Crim. App. 2007) (rejecting defendant's claim that the death penalty "should have been precluded in his case because the grand jury did not pass on the punishment special issues when deciding whether to indict him"). Point of error thirty-two is overruled.

In points of error thirty-three through thirty-nine, appellant presents various constitutional challenges to what he characterizes as the "fetal homicide statute."[36] As part of his constitutional challenges, appellant cites to § 1.07(a)(26) of the Texas Penal Code, which defines an "individual" as "a human being who is alive, including an unborn child at every stage of gestation from

---

[36] *See* Acts 2003, 78th Leg., vol. 3, pages 2608-2609, Ch. 822 (SB 319), eff. Sept. 1, 2003.

fertilization until birth." Appellant also cites to § 19.06, TEX. PEN. CODE, which does not make the death of an unborn child a homicide under circumstances not present in this case (such as abortion "with the requisite consent" and other conduct committed by the mother of the unborn child).

Appellant claims that his capital-murder conviction "depended on these unconstitutional changes because he was charged with killing two people ([Sanchez] and their not-yet-viable, not yet quickened, two and-a-half-month-old fetus) during the same transaction." (Footnotes omitted). In point of error thirty-three, he claims that § 1.07(a)(26) "violates the Due Process and the Supremacy Clauses by defining fertilized eggs, embryos, and fetuses as persons." In point of error thirty-four, he claims that § 1.07(a)(26) "violates the Establishment Clause by defining life as beginning at fertilization." In point of error thirty-five, he claims that § 1.07(a)(26) "is an arbitrary classification and violates the Equal Protection Clause." In point of error thirty-six, he claims that § 1.07(a)(26) "permits the arbitrary imposition of the death penalty and violates the Eighth Amendment." In point of error thirty-seven, he claims that his conviction "violates the Equal Protection Clause of the United States Constitution because § 19.06 discriminates on the basis of gender." In point of error thirty-eight, appellant claims that his conviction "violates the Texas Equal Rights Amendment because § 19.06 discriminates on the basis of gender." And in point of error thirty-nine, appellant claims that § 1.07(a)(26) "is unconstitutionally void for vagueness under the 14th and 8th Amendments to the U.S. Constitution."[37]

---

[37] In this point of error, appellant claims that the definition of individual in § 1.07(a)(26) "allows a jury to impose a death sentence even where neither the defendant nor the woman knew that she was pregnant and even if the defendant did not know his actions would kill the embryo or fetus." We note, however, that this case does not present this scenario. In addition, since § 19.03(a)(7) requires two intentional or knowing murders, a defendant could not be convicted of capital murder under § 19.03(a)(7) if the defendant "did not know his actions would kill the embryo or fetus." *See*

The record reflects that appellant filed a "motion to declare application of the death penalty to the non-consensual termination of a pregnancy unconstitutional." It is questionable whether this motion preserved many of the claims presented in points of error thirty-three through thirty-nine. For example, this motion does not even cite to § 19.06, and it makes no claim that § 19.06 discriminates on the basis of gender under either the federal or state constitutions (as claimed in points of error thirty-seven and thirty-eight). The record further reflects that the trial court denied this motion at a pretrial hearing during which appellant claimed only that § 1.07(a)(26) violated the United States Supreme Court's decision in *Roe v. Wade*, 410 U.S. 113 (1973).[38]

> [TRIAL COURT]: And then the last [motion] I've got is the declaration of the death penalty on the nonconsensual termination of the pregnancy? What did you have on that?
>
> [THE DEFENSE]: That's correct, Judge.
>
> This all came about when in 2003, the legislature changed the Penal Code section 1.07 (a) (26) and the definition of individual to every state of gestation, from fertilization to birth. So the liability in that particular section doesn't appear to have any meaning that, you know–and Roe v. Wade is a civil case, but that's the United States Supreme Court case that gives us the definition of when life begins, and it certainly isn't at conception. There are several states that have said–and this case has not been–this type of issue has not been litigated in this context by the United States Supreme Court. Some states have said it's constitutional, some states have not–have said it isn't.
>
> In my motion, I attached a section, just for example, out of the Health and Safety Code, Title 2, Subtitle 8, chapter 170, section 170.001 (3), which says, that, "Viable means the stage of fetal development when in the medical judgment of the attending physician" an unborn child has the capacity to live outside the mother's womb.

---

*Roberts*, 273 S.W.3d at 329.

[38] Appellant cites to no other portions of the record where he might have preserved the claims presented in points of error thirty-three through thirty-nine.

It just–it makes no logical sense to say that this–in our case, especially, because we have a ten-week old fetus, no–I don't anticipate any argument that this fetus would have been viable outside the mother's womb, to charge capital murder based on the death of this nonviable potential human being. I think it's exceptionally unconstitutional.

If they, you know, wanted to do–I just don't think there is anything that can justify this new definition of life for what they are trying to do in this case. It violates everything. It violates Roe v. Wade, and all–just all the established law at least for the last 30 years. And I think that, you know, if this does ever get litigated all the way up, there is a chance it could be held to be an unconstitutional definition of when life does begin.

[TRIAL COURT]: Okay. State?

[STATE]: Judge, if you look at the actual arguments that are made in [the defense] motion, the first thing she does is challenge it on the basis of the Eighth Amendment. And in that, she's arguing essentially that the Texas Legislature did not actually amend the capital murder statute, and just by changing the definition of individual, that somehow this creates a new type of capital murder without an actual amendment by the legislature.[39]

One, that is not correct because when they amended the definition by the–when the legislature amended the definition of individual, they didn't have to change the statute. The statute already covered that by making murder of two or more individuals within the same criminal transaction a capital murder.

[The defense] talks about the fact that it violates Roe v. Wade. First off, Judge, this is a criminal context. It is not a civil context as Roe v. Wade was put in. Second of all, if you look at Roe v. Wade, and, in fact, if you look at the portion of Roe v. Wade that she cites in her motion, the Court, the Supreme Court limits Roe v. Wade to simply a situation where mom's rights and baby's rights come in conflict. That is not the situation that we have here. In Roe v. Wade they said the State has no compelling interest to intervene when it's talking about a conflict between mom and the unborn child.

Texas and its law in no way infringes upon Roe v. Wade because in this case we criminalize activity where mom and baby's interests are the same. In this case, we are talking about mom, who is also a victim, the child is taken without her consent, and the State's interest is not in conflict because it specifically excludes legal

---

[39] We do not read points of error thirty-three through thirty-nine to present this claim.

abortion as an exception to this law. So <u>Roe</u> is not an issue here.

There are some other arguments that [the defense] made in the motion that are not made–were not made verbally. If the Court would like me to address those, I would be happy to; otherwise, I'm just dealing with what [the defense] has actually voiced today.

[TRIAL COURT]: Okay. I've reviewed the motion and authorities therein, and under the current state of the law, or lack thereof of any authority, I'm going to overrule the motion.

On this record, we decide that the only claim preserved for appellate review is the claim presented in point of error thirty-three that § 1.07(a)(26) violates *Roe v. Wade*. *See Karenev*, 281 S.W.3d at 434 (defendant may not raise for first time on appeal a facial challenge to constitutionality of a statute); *Curry v. State*, 910 S.W.2d 490, 496 (Tex. Crim. App. 1995) (same with respect to "as applied" constitutional challenge). In *Lawrence v. State*, this Court held that *Roe* "has no application to a case that does not involve [a] pregnant woman's liberty interest in choosing to have an abortion" and that *Roe* has no application "to a statute that prohibits a third party from causing the death of [a] woman's unborn child against her will." *See Lawrence v. State*, 240 S.W.3d 912, 917 (Tex. Crim. App. 2007), *cert. denied,* 128 S.Ct. 2056 (2008). Points of error thirty-three through thirty-nine are overruled.[40]

---

[40]

We further note that, in *Flores v. State*, this Court decided that § 1.07(a)(26) does not violate the Establishment Clause (point of error thirty-four). *See Flores v. State*, 245 S.W.3d 432, 438 (Tex.Crim.App. 2008). In point of error thirty-five, appellant argues that, by allowing "criminal punishment for 'killing' of a non-implanted fertilized egg," § 1.07(a)(26) violates Equal Protection principles because its "classification fails to meet Texas's interest in protecting human life" and it "impermissibly reflects the concerns of a handful of religions, instead of a legitimate state interest." In point of error thirty-six, appellant argues that § 1.07(a)(26) violates the Eighth Amendment for essentially the same reasons. The Texas Alliance for Life Trust Fund argues, among other things, in an *amicus curiae* brief that appellant lacks standing to challenge the application of § 1.07(a)(26) "to the killing of a 'non-implanted fertilized egg' because the expert evidence presented at trial showed that [Sanchez] was three months pregnant when appellant stabbed and killed her and her

In point of error forty, appellant raises numerous ineffective-assistance-of-counsel claims relating to the guilt and punishment phases of trial. Due to our disposition of point of error two, we find it unnecessary to address the claims relating to the punishment phase of trial. With respect to the guilt phase, appellant presents a lengthy list of counsel's alleged deficiencies. He claims that counsel was ineffective for failing to object to "victim impact" evidence at the guilt phase.[41] He also raises counsel's "ineffective failure in permitting erroneous guilt phase charge."[42] He also claims

---

unborn child." We also believe that our decisions in *Lawrence* and *Flores* would resolve the claims presented in points of error thirty-five and thirty-six adversely to appellant.

In points of error thirty-seven and thirty-eight, appellant claims that § 19.06(1) violates equal-protection and equal-rights principles under the federal and state constitutions because it exempts from criminal liability for murder the "conduct committed by the mother of the unborn child." Since there is no evidence that Sanchez was cooperating with appellant in killing her unborn child, we believe that our decision in *Flores* would resolve this claim adversely at appellant. *See Flores*, 245 S.W.3d at 436-37 ("Only if the acts were consensual could [defendant] argue that the statute treated him and [the mother] unequally by allowing the State to prosecute [defendant] but not [the mother] for the same acts."). We further note that the Texas Alliance for Life Trust Fund argues in its *amicus curiae* brief that, after exempting the conduct of the mother pursuant to the principles in *Roe v. Wade*, § 19.06 treats male and female perpetrators identically. *See, e.g., Commonwealth v. Bullock*, 913 A.2d 207, 215 (Pa. 2006) (rejecting equal-protection challenge similar to that presented here and deciding that the legislature had a legitimate basis for distinguishing between the mother and everyone else). Finally, in point of error thirty-nine, appellant claims that he "could not know what conduct would be prohibited by the statute." We believe that our decision in *Lawrence* would resolve this claim adversely to appellant. *See Lawrence*, 240 S.W.3d at 915-16 ("By expressly defining capital murder such that one of the victims may be any unborn child from fertilization throughout all stages of gestation, the statute leaves no ambiguity as to what conduct is proscribed.").

[41] Appellant argues, for example, that counsel was ineffective for failing to object to Sanchez's mother's testimony identifying a photograph of Sanchez as "my beautiful daughter" and describing Sanchez's plans for a senior trip and her plans to become a missionary.

[42] Appellant claims that counsel was ineffective for not objecting "to the trial court's failure to charge the jury on the statutory definition of an unborn child." He claims that had "the jury known that the death of the fetus is different from the death of mother [sic] . . . and therefore that the intent to cause a fetus's death is also different from the intent to cause a pregnant mother's death, there is more than a reasonable probability that it would have acquitted." Our review of the record, however, indicates that the jury knew "that the death of the fetus is different from death of the mother."

that counsel was ineffective for not objecting to "erroneous and unconstitutional jury instructions" as "demonstrated in Point 24." He then raises claims of "other ineffectiveness." He claims that counsel repeatedly failed "to object to inadmissible evidence, including:" 1) Greiner's testimony that she believed appellant was "self-centered," 2) the medical examiner's testimony that a person stabbed thirteen times would feel thirteen cuts, 3) police testimony about other suspect statements in other cases including police testimony that confessing murder suspects may conceal certain facts, 4) testimony about the damage to the hymen of appellant's underage girlfriend (Vargas), and 5) more victim-impact evidence. Appellant also claims that counsel "failed to pursue all available means of suppressing prejudicial evidence." We decide that the record is not sufficient to address appellant's ineffective-assistance-of-counsel claims since it does not sufficiently show that counsel's representation was, for example, lacking in tactical and strategic decisionmaking. *See Bone v. State*, 77 S.W.3d 828, 833 (Tex. Crim. App. 2002) ("Under normal circumstances, the record on direct appeal will not be sufficient to show that counsel's representation was so deficient and so lacking in tactical or strategic decisionmaking as to overcome the presumption that counsel's conduct was reasonable and professional."). Point of error forty is overruled.

In point of error forty-one, appellant claims that "this Court should reverse due to cumulative harm of the errors." Appellant's entire argument in support of this point asserts, "If the Court finds two or more errors harmless, Appellant is entitled to reversal due to the **cumulative harm** of the errors" (emphasis in original). *See also Chamberlain*, 998 S.W.2d at 238 ("But, we are aware of no authority that non-errors may in their cumulative effect cause error."). In light of our disposition of point of error two, our resolution of this point will pertain to the guilt-phase of appellant's trial. On this record, we cannot say that "two or more errors" that may have occurred at the guilt-phase in this

case rendered this phase of appellant's trial fundamentally unfair. *See United States v. Bell*, 367 F.3d 452, 471 (5th Cir. 2004) ("The cumulative error doctrine provides relief only when constitutional errors so 'fatally infect the trial' that they violated the trial's 'fundamental fairness.'"). Point of error forty-one is overruled.

In point of error forty-two, appellant asserts, "An arbitrary, freakish, disproportionate outlier, entirely unsupported by the evidence, this death sentence violates the 8[th] and 14[th] Amendments." In point of error forty-three, appellant makes the same assertion under the Texas Constitution. In these points, we understand appellant to argue that the evidence is legally insufficient to support the jury's answers to the future-dangerousness special issue and to the mitigation special issue under the federal and state constitutions. We have decided in point of error one that the evidence is legally sufficient to support the jury's answer to the future-dangerousness special issue. And we do not review the sufficiency of the evidence to support the jury's answer to the mitigation special issue. *See Russeau v. State*, 171 S.W.3d 871, 886 (Tex. Crim. App. 2005). Points of error forty-two and forty-three are overruled.

In point of error forty-four, appellant asserts, "Texas prosecutors' unfettered, standardless and unreviewable discretion violates Equal Protection, Due Process and the Eighth Amendment." We have rejected these and similar claims. *See Luna v. State*, 268 S.W.3d 594, 608 (Tex. Crim. App. 2008). Point of error forty-four is overruled.

This Court sustaining points of error four, twenty-one, and twenty-two would not result in any greater relief to appellant than he has received pursuant to our disposition of point of error two. We nevertheless address these points since they were preserved and are likely to re-occur at a new punishment hearing.

Appellant claims in point of error four that the "trial court committed reversible error by failing to instruct the jury that the mere fact that a capital offense is committed is insufficient in itself to warrant a finding of future dangerousness." Appellant claims that the trial court erroneously denied his request for this instruction under *Dinkins*. *See Dinkins*, 894 S.W.2d at 358 (stating in a legal-sufficiency analysis of future-dangerousness special issue that mere fact that a capital offense is committed "is insufficient in itself to prove future dangerousness" even though "the circumstances of the offense alone may be sufficient to sustain the jury's affirmative answer" to this special issue).

> [THE DEFENSE]: And I would like an instruction making sure that they don't decide there's a future danger simply and only because the offense was committed, because it's the facts of the offense that determines whether or not they consider that as future danger, not the fact that it was committed.
>
> [THE COURT]: Did they give them an instruction in that case?
>
> [THE DEFENSE]: In <u>Dinkins</u>, yes.
>
> [THE COURT]: They gave the instruction?
>
> [THE DEFENSE]: It's not–it's part of the dicta. It's not–I'm not sure that it might not have been waived. It was written on an [sic] appeal. Because in the main paragraph of the holdings, that's not specifically mentioned. But they do mention it as being an appropriate standard in terms of what they are not to do.
>
> [THE STATE]: I thought that was just referring that we weren't supposed to argue that or make it for cause.
>
> [THE COURT]: I don't think there's an actual jury instruction to that effect.
> * * *
> I'm going to track the statute on that, so I will deny that request.

The State argues that the trial court properly denied appellant's requested jury instruction because such an instruction would have been an improper judicial comment on the evidence under this Court's decision in *Brown v. State*, 122 S.W.3d 794, 796, 802 (Tex. Crim. App. 2003) (trial court's neutral jury instruction that "Intent or knowledge may be inferred by acts done or words

spoken" was improper judicial comment on the evidence because it improperly told the jury how to consider certain evidence before it). We agree. Point of error four is overruled.

In point of error twenty-one, appellant claims that the "trial court violated appellant's right to present mitigation evidence." The record reflects that Weir Labatt, a former San Antonio city councilman, testified at the punishment phase that he had known appellant for many years. The trial court sustained the State's hearsay objections **after** Labatt testified that appellant's "dream from a little boy was to be a firefighter" and that appellant called Labatt from jail and expressed condolences to Labatt after Labatt's mother-in-law died. The State did not request an instruction to disregard Labatt's testimony, and the trial court did not give one.

Q. [THE DEFENSE]: Did he ever discuss with you what his plans were for his future?

A. [LABATT]: His dream from a little boy was to be a firefighter.

[THE STATE]: I'm going to object. That calls for a hearsay response, or he was responding to hearsay.

[THE DEFENSE]: Your Honor, it's a statement from the Defendant.

[THE COURT]: I'll sustain the objection.

* * *

Q. Now, when did your mother-in-law pass away?

A. My mother-in-law passed away this last November, on November 1st, and soon thereafter we received a call from Adrian. He was in jail at the time, telling us how sorry he was –

[THE STATE]: Object to hearsay response.

[THE COURT]: All right. Sustained.

Q. Was he expressing his condolences?

A. He was expressing his condolences, that's correct.

Q. During the years, actually his whole life that you've known Adrian, was he ever violent or disrespectful?

We hold that the trial court correctly sustained hearsay objections when Mr. Labatt attempted to testify about appellant's future aspirations and a phone call he received from appellant. Additionally, it is the responsibility of the proponent to inform the court of the existence of an exception to the hearsay rule. *See Vinson v. State*, 252 S.W.3d 336, 340 (Tex. Crim. App. 2008) (Once an objection is made, the proponent must demonstrate that the proffered evidence overcomes the stated objection). Here, defense counsel failed to proffer with any specificity an exception to the hearsay rule. Moreover, the record reflects that Mr. Labatt fully answered defense counsel's questions *before* the objections were sustained. We have recently held that sustaining the State's objection is not a curative measure meant to remove the objectionable statements from the jury's consideration. *See Young*, 137 S.W.3d at 69 ("An objection serves as a preemptive measure. Because it informs the judge and opposing counsel of the potential for error, an objection conserves judicial resources by prompting the prevention of foreseeable, harmful events."). Thus without an instruction to disregard, the testimony in question was before the jury and they were free to consider the same as mitigating evidence.

Defense counsel also elicited testimony regarding condolences expressed by the appellant. Again, the trial court correctly sustained the late objection without further ruling and an exception to the hearsay rule was not proffered. *Vinson v. State*, 252 S.W.3d at 340. The jury was free to consider this evidence as well. Point of error twenty-one is overruled.

In point of error twenty-two, appellant claims that the trial court "committed reversible error by permitting well more than a 'quick glimpse' of victim impact evidence." Appellant does not provide any specific citations to the record where he claims that inadmissible victim-impact evidence

was presented to the jury. Appellant does assert in his brief that this evidence "included a friend's testimony about the victim's relationship with an intermittent friend, a reading from the victim's journal about Appellant and their relationship, testimony about her family missing her, testimony that the victim 'pampered' her mother, photographs of her bedroom, the victim's father's anger and inability to hold a job, the father's mistreatment by his church, and the anger of the victim's siblings."

Our review of the punishment-phase record indicates that only Sanchez's mother and father presented "victim-impact" and "victim-character" evidence.[43] Before this evidence was admitted, appellant claimed, among other things, that it should have been "excluded on prejudicial grounds."

The punishment-phase record reflects that Sanchez's mother read portions of Sanchez's journal. For example, Sanchez's mother read the following from Sanchez's journal:

Q. [STATE]: Mary, I'm going to ask you to read State's 79 to the jury please.

A. "Where to start. Oh, woe me [sic] and [appellant]. Now, we've been broken up for two months now. At first it was really hard to deal with. I thought I was going to go crazy and kill myself, but I dealt with it each day by myself just crying and, basically, hating myself. Me and [appellant] would talk twice a week, so that helped me get through it a lot. I was so angry with him. Finally sit down and he asked me if we could just be friends. So of me being as stupid as I am, I said of course. But when he asked me if I could meet him at his office the next day so that we could hang out and just talk, so I told him yes. And the next day I met him, and we had sex. And he hasn't talked to me since."

Q. Before you go on to the second entry in the journal, what is the date on that part of the journal?

A. September 25th, '05.

---

[43]

The State's case-in-chief at the punishment phase takes up 116 pages in the reporter's record. The testimony of Sanchez's mother and father take up about eight of these pages.

Q. [STATE]: Okay. Now, go ahead and read the second entry. What is the date on the second entry?

A. [SANCHEZ'S MOTHER]: December 3rd, '05. "Okay, so looking back on the last thing that I wrote in here, I found out that I was pregnant. I am two months and a couple of weeks. [Appellant] doesn't want to have anything to do with me. He has told me he hates me through this whole experience. I found out that this world is filled with bitches and assholes."

Sanchez's mother also testified:

Q. [STATE]: Now, Mary, let's talk a little bit about [Sanchez] as you knew her prior to her death. Would you describe the relationship that you and she had?

A. [SANCHEZ'S MOTHER]: Me and [Sanchez] were very, very close. She was my first born. She would pamper me a lot. Instead of me pampering her, she would pamper me a lot. I could always go somewhere and tell the kids I was leaving and she was the one that was always there behind me ready to go with me. Me and [Sanchez] would spend a lot of time together and I really miss her.

Q. There were special things that you and [Sanchez] enjoyed doing together?

A. Just hanging out together, going to the mall, taking her to the mall, Favorite thing is going in the room, "What are we going to eat?" I miss her.

Q. Can you talk a little bit about what the impact of her death has been on your family?

A. They miss her. Each and every one of them miss her. Each and every one of them had a relationship with her. Always coming to her for their–for her opinion on a lot of things.

Q. Has her death impacted the way that your family is able to interact or get along with one another?

A. I have noticed that the kids are very quick to jump at each other.

Q. Is that a change since before her death?

A. Yes.

Q. Now, I think in your guilt/innocence testimony, you talked a little bit about [Sanchez] wanting to do missions work after she graduated; is that right?

A. She was actually looking into it already. It was a trip she wanted to take.

Q. I'm going to show you State's 26–sorry. Let me get them in order. 23, 24, 25, and 26, can you look at them and tell the jury what do you–first of all, do you recognize these photographs? Go ahead and look through them.

A. Yes, this is her bedroom. She loved taking pictures.

Q. I see you just pointed at one of the photographs, State's 24. What were you pointing at in that photograph?

A. It says she was sold out for Jesus.

Q. Now, are State's 23 through 26 a true and accurate depiction of what [Sanchez's] room looked like at the time of her death?

A. Yes.

Q. And would they be helpful to the jury in giving them an idea of kind of her personality, likes and dislikes, and the things she was interested in?

A. (Nodded head affirmatively.) Yes.

Sanchez's father testified:

Q. [STATE]: Mr. Vargas, have there been specific things that have changed your family since Stephanie's death?

A. [SANCHEZ'S FATHER]: Yes. Everything. I can't hold a job. My family can't go out–they go to school, you know. They are angry. Me and my wife, we don't–it destroyed what we got. I got another daughter and two boys, but it's a big–it's like a big part, you know, and it's just rough on them. How–I can't–I don't–I don't want them to go to the movies. I don't–I can't be with them all the time, right?

I don't–how am I going to be here if they are there? And this is the church that I had faith and trusted in, and then for them to do this? And then–and then–and then–and now for me to let my family go out into the world is–is twice as hard, right? Or–I don't want them to do anything. I want them with me all the time–all the time.

I don't trust nobody. I don't trust nothing. That's–that's–and you worry about them. **You ask me how it affects me? I walked in the house, when I walked in the house my kids were with me. I went to pick them up from school.**

Everybody just asks how it affects me or how it affects my wife. My kids, they have

to grow up. They have their whole lives ahead of them. Forget about me, about my wife. **What about my kids? What–they saw their sister like that**. I think are they going to finish school and go to college? What are they going to turn to? Are they going to turn into alcoholics? They are pissed off. They are mad. If I am pissed off, can you imagine with them?

How can something like that happen? I mean, how can–how can he do something like that to his--

(Emphasis supplied).

We have decided that trial judges "should exercise their sound discretion in permitting *some* evidence about the victim's character and the impact on others' lives while limiting the amount and scope of such testimony." *See Salazar v. State*, 90 S.W.3d 330, 336 (Tex. Crim. App. 2002) (emphasis in original) (*quoting Mosley v. State*, 983 S.W.2d 249, 262-63 (Tex. Crim. App. 1998)). "Victim-character" evidence is designed to give the jury "'a quick glimpse of the life that the [defendant] chose to extinguish, to remind the jury that the person whose life was taken was a unique human being.'" *See Salazar*, 90 S.W.3d at 335. "Victim-impact" evidence is designed "to remind the jury that murder has foreseeable consequences to the community and the victim's survivors--family members and friends who also suffer harm from murderous conduct." *See id*. On this record, we decide that the trial court admitted the victim-character and victim-impact evidence for their proper purposes and that the trial court "place[d] appropriate limits upon the amount, kind, and source of victim impact and character evidence." *See Salazar*, 90 S.W.3d at 336 (*quoting Mosley*, 983 S.W.2d at 262-63)); *see also Scheanette v. State*, 144 S.W.3d 503, 508 (Tex. Crim. App. 2004) ("victim-impact evidence may be relevant to counteract the mitigating evidence the defendant is entitled to introduce"); *Jackson v. State*, 33 S.W.3d 828, 833-34 (Tex. Crim. App. 1999) ("victim-impact" evidence "of which a defendant is aware at the time he commits the crime is necessarily relevant to his future dangerousness and moral culpability"). Point of error twenty-two is overruled.

In point of error twenty-three, appellant claims that the "prosecution violated [appellant's] constitutional rights through repeated instances of misconduct during its sentencing phase summation." In point of error twenty-nine, appellant claims that the "trial court committed reversible error by refusing to charge on residual doubt as mitigating evidence." In point of error thirty, appellant claims that the trial court "committed reversible error by charging that [appellant's] prior bad acts pertained to the mitigation special issue."[44] In point of error thirty-one, appellant claims that the "trial court committed reversible error by instructing the jury it could not rely on sympathy to reach a life sentence."[45]

The record, however, reflects that appellant did not preserve any of these claims for appeal. The record reflects that appellant made no objections to any of the State's "sentencing phase summation" (point of error twenty-three). And, though pages 275 to 276 of the Clerk's Record indicate that appellant filed a motion to charge the jury on residual doubt as mitigating evidence, the

---

[44]

In support of point of error thirty, appellant cites to "24 CR 7-8." We are not sure what portion of the Clerk's record is meant to be identified by this. The punishment charge is set out at pages 548 to 556 in Volume Two of the Clerk's Record. As far as we can tell, the following instruction at page 551 of the Clerk's Record is the subject of appellant's complaint in point of error thirty:

> In this case evidence has been admitted to the effect that the defendant may have committed offenses or other acts of misconduct other than that for which you have convicted him. The court instructs you that you may consider this evidence in determining the answers to the Issues in the case at hand but you may only consider the evidence if you first find beyond a reasonable doubt that the defendant committed these other offenses.

[45]

The trial court's charge stated:

> You are further instructed that in answering the Issues submitted to you, the jury must not be swayed by mere sentiment, conjecture, sympathy, passion, prejudice, public opinion or public feelings.

record does not reflect that appellant brought this motion to the trial court's attention and obtained the trial court's ruling on it (point of error twenty-nine). *See* TEX. R. APP. PROC. 33.1(a)(2)(A). The record also fails to reflect that appellant objected to the trial court's "charging that [appellant's] prior bad acts pertained to the mitigation special issue" (point of error thirty) and to the trial court's "anti-sympathy" charge (point of error thirty-one). We find it unnecessary to address the merits of these unpreserved claims even ones that are likely to reoccur at a new punishment hearing. Points of error twenty-three, twenty-nine, thirty, and thirty-one are overruled.

We affirm appellant's conviction, set aside his death sentence, and remand the case to the trial court for a new punishment hearing.

Hervey, J.

Delivered: June 16, 2010
Publish