

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————————

No. 02-19-00404-CR

———————————————————

HENRY CURTIS MAYO, Appellant

V.

THE STATE OF TEXAS

———

On Appeal from the 415th District Court
Parker County, Texas
Trial Court No. CR19-0317

———

Before Birdwell, Bassel, and Womack, JJ.
Memorandum Opinion by Justice Bassel

**MEMORANDUM OPINION**

Appellant Henry Curtis Mayo led law-enforcement officers on a nearly fifty-mile high-speed chase; he was convicted of evading arrest or detention with a vehicle while using a deadly weapon. Mayo challenges his conviction on three grounds which we construe as two:[1] (1) he contends that the trial court erred by admitting two portions of evidence—speculative testimony from one of the officers involved in the chase and hearsay statements recorded on the officer's body camera—and (2) Mayo claims that the evidence is insufficient to support the jury's deadly-weapon finding. Neither argument is persuasive; any error in the admission of the challenged evidence was harmless, and the record more than supports the jury's deadly-weapon finding. Therefore, after modifying a clerical error in the judgment sua sponte, we affirm.

## I. BACKGROUND

Mayo led law-enforcement officers on a lengthy high-speed chase in February 2019. The chase occurred just past midnight and extended across multiple counties, attracting officers from at least three different law-enforcement agencies in a caravan behind Mayo's newly purchased Crown Victoria.

---

[1]We reorder Mayo's points to mirror the logical and chronological sequence of the trial.

## A. The Chase

The events began when a concerned citizen, Alex Boterf, called the Willow Park Police Department around midnight to report Mayo's erratic driving.[2] Boterf later testified that Mayo was driving in the left lane of Interstate 20 but would "choose to get over a lane or two just because there[ was] a car there," then "get up five, ten feet from the back of the next car's bumper" before "swing[ing] past them" and "whip[ping] around them at the last second." By Boterf's estimate, Mayo repeated his "whip[ping]" maneuver at least "eight or nine" times. Boterf followed Mayo from a distance until law enforcement arrived.

Willow Park Police Officer Ryan Malwitz responded to the call and identified Mayo's vehicle from Boterf's description. After clocking Mayo's speed at 92 mph,[3] Officer Malwitz attempted to pull Mayo over. But rather than stopping his vehicle, Mayo accelerated to 107 mph and turned his lights off, causing Officer Malwitz to lose sight of Mayo's vehicle in the fog. The officer reported these events to the police dispatcher who in turn notified the Parker County Sheriff's Office.

Almost immediately, Parker County Deputy Colby Scudder spotted Mayo's vehicle on Interstate 20. Or, rather, he encountered Mayo's vehicle—while Deputy

---

[2]Before calling the Willow Park Police Department, Boterf attempted to contact two other police departments to report Mayo's erratic driving.

[3]The speed limit on Interstate 20 was 70 mph. In addition to speeding, Officer Malwitz noted that Mayo's temporary rear license plate was folded so that the officer could not read the numbers.

3

Scudder was driving in the right lane, Mayo came up behind him and passed him on the right by driving on the shoulder of the highway without his headlights activated. Deputy Scudder activated his overhead lights in an attempt to pull Mayo over. But as he did with Officer Malwitz, Mayo did not pull over; instead, Mayo tailgated another right-lane vehicle until the driver hit the brakes, forcing Mayo to slam on his brakes as well. Deputy Scudder watched as the tailgated vehicle swerved off the road, traveling across a right-side bar ditch and up an embankment onto the parallel service road. Mayo similarly lost control of his car; he swerved to the left of the tailgated vehicle then spun across the highway into the right-side bar ditch, coming to a stop, facing in the opposite direction. Deputy Scudder pulled over and notified the police dispatcher that Mayo had "crashed out," but before the deputy could exit his vehicle, Mayo returned to the roadway and began accelerating again.

In the near-half-hour that followed, Mayo led Deputy Scudder on a high-speed chase for approximately forty-eight miles. As the night progressed, more law-enforcement officers and agencies became involved; Parker County Deputy Jeremy Tharp joined the caravan of police cars trailing Mayo,[4] as did a game warden, a Weatherford Police Department officer, and multiple officers from the Department of Public Safety. Throughout the chase, Mayo continued to closely tailgate other vehicles in an aggressive, threatening manner, while also swerving around, in front of,

---

[4]A trainee accompanied Deputy Tharp and drove his police car during the chase.

4

between, and "at" eighteen-wheelers on the highway. Deputy Scudder and Deputy Tharp later described how Mayo would "be driving in the left lane[ and] as soon as he would be coming up on traffic, he would s[w]erve into their lane" and "get right on [th]em" before "cut[ting] straight back into the left lane" at the last minute; "it appeared [Mayo] was trying to make them wreck."

Finally, after Mayo successfully dodged two sets of spike strips laid on the highway to flatten his tires, he hit a third set of spike strips, causing one of his tires to smoke. He slowed to a halt. The trailing police caravan encircled Mayo, but before anyone could approach his vehicle, Mayo got out and began walking toward the officers with a cell phone in his hand. Indeed, Mayo remained on the phone throughout his arrest and repeatedly stated—presumably to his father, with whom Mayo was on the phone—that the police were trying to shoot him.

## B. The Trial

Mayo was indicted for third-degree-felony evading arrest or detention with a vehicle, and the State sought a finding that Mayo had used his vehicle as a deadly weapon in the commission of the offense.[5] *See* Tex. Code Crim. Proc. Ann. art. 42A.054(b), (c); Tex. Penal Code Ann. §§ 1.07(a)(17), 38.04(b)(2). Although Mayo admitted speeding and leading the police on a chase, he pleaded not guilty and requested a jury trial. Mayo argued that he had been evading the police out of

---

[5]Specifically, Mayo's indictment alleged that he evaded arrest or detention by Deputy Scudder.

necessity due to a reasonable fear for his life, and he denied using his vehicle as a deadly weapon.

At trial, the State called Boterf, Officer Malwitz, Deputy Scudder, and Deputy Tharp, who all testified regarding Mayo's manner of driving. Deputies Scudder and Tharp detailed the chase and Mayo's evasion.

To corroborate this testimony and display the events of the night, the State offered (1) a copy of Deputy Scudder's body-camera footage taken while he was chasing Mayo, (2) a copy of the first two minutes of Deputy Scudder's dash-camera video footage from the chase,[6] and (3) a copy of Deputy Tharp's dash-camera video from the chase.[7] The three videos depicted different portions of the chase from various vantage points in the police caravan, with many overlapping elements. As relevant to this appeal, Deputy Scudder's body-camera footage captured the full twenty-eight-minute chase, but the video was taken from Deputy Scudder's lap— without a view out the front window. The body-camera video thus primarily contained the police-radio conversations between Deputy Scudder, Deputy Tharp, and the police dispatcher during the chase. Deputy Scudder's dash camera only

---

[6]Deputy Scudder explained that his dash-camera video "use[d] Bluetooth and WiFi to transmit video to [his] laptop[]" where he could record and submit the video. "[I]f [he] los[t] Bluetooth or WiFi, that los[t] the connection, obviously, [between] the camera and the laptop," preventing a complete recording. Consequently, less than two minutes of the chase were recorded on Deputy Scudder's dash-camera video.

[7]The State also offered an audio recording of Boterf's phone call to the Willow Park Police Department.

recorded the first two minutes of this twenty-eight-minute chase, but it provided a brief dashboard view of Mayo's driving while also duplicating two minutes of the police-radio conversations. The third video, Deputy Tharp's dash-camera video, contained approximately twenty-two minutes of the twenty-eight-minute chase;[8] it provided a dashboard view of the chase from Deputy Tharp's location several cars behind Deputy Scudder in the caravan, and it duplicated twenty-two minutes of the police-radio conversations contained in Deputy Scudder's body-camera footage.

Mayo called only one witness in his defense: himself. Mayo told the jury that, before Officer Malwitz arrived, the other vehicles on the highway had "boxed [him] in," making him concerned that the other motorists might shoot him.[9] Then when Officer Malwitz attempted to pull Mayo over, Mayo claimed he motioned for the officer to follow him to a well-lit area. Mayo explained that because the highway was dark and the other motorists posed a shooting risk, he had not stopped because he was "looking out for [his] and [the officer's] safety." But while he was still looking for a well-lit area, Mayo claimed Officer Malwitz "zoomed up on [him]" in a manner that reminded Mayo of "chasing that [he] done seen on TV," leading him to believe that

---

[8]Deputy Tharp's dash-camera video began approximately six minutes into Deputy Scudder's body-camera footage.

[9]Mayo testified that this concern for his safety was the reason why he drove in the left lane: "Because if somebody was going to shoot off in [his] car, . . . if [he] was in the right lane, [another motorist] could easily drive up on the driver's side of [his] door, so [he] made sure [his] driver['s] door stayed in the left lane."

7

the officer "wanted to pit maneuver [him]" or "skid [him] out."[10]  Mayo thus asserted

that he fled the police "[b]ecause [he] was scared" he "would get shot."  He further

testified that he was on the phone with his father and grandmother "[p]ractically the

entire time" and was telling them his fears that the other motorists were "fixing to

shoot [him]."

On cross examination, Mayo admitted that, at the time of the chase, he was on

felony probation for being a felon in possession of a firearm.  He denied knowing,

however, that there was a felony warrant for his arrest for carjacking he was alleged to

have committed in Mississippi.  Mayo similarly denied knowledge of a prior deferred

adjudication he served for fleeing or eluding law enforcement, and he denied

knowledge of a prior conviction for possession of cocaine.  However, Mayo conceded

that the State's documentation showed that the judgments had been entered against a

person with his name, social-security number, and birthdate.[11]

The jury found Mayo guilty of evading arrest or detention with a vehicle and

found the deadly-weapon allegation to be true.  *See* Tex. Code Crim. Proc. Ann. art.

---

[10]When asked to explain to the jury what a "pit maneuver" was, Mayo testified that, on "TV shows like World's Wildest Police Videos . . . police call it [a] pit maneuver when they try to stop a suspect . . . at a high rate of speed."

[11]When confronted with his prior convictions, Mayo initially stated that he was "unable to think about incidents" or to "think back that far."  Then, when pressed, he denied any knowledge of the convictions and referenced his wallet having been stolen, implying that he was a victim of identity fraud.

42A.054(b), (c); Tex. Penal Code Ann. § 1.07(a)(17). The trial court heard brief punishment evidence and sentenced Mayo to eight years' confinement.[12]

## II. DISCUSSION

Mayo challenges (1) the trial court's admission of allegedly speculative testimony from Deputy Scudder and of hearsay statements in the deputy's body-camera footage, and (2) the sufficiency of the evidence to support the jury finding that Mayo used his vehicle as a deadly weapon. We reject both arguments.

## A. Evidentiary Objections

First, Mayo claims the trial court erred by admitting two portions of evidence.

### 1. Applicable Law

"It is well established that the improper admission of evidence does not constitute reversible error if the same facts are shown by other evidence which is not challenged." *Leday v. State*, 983 S.W.2d 713, 717 (Tex. Crim. App. 1998) (quoting *Crocker v. State*, 573 S.W.2d 190, 201 (Tex. Crim. App. [Panel Op.] 1978)). This rule renders the admission of evidence harmless when a defendant fails to object at trial to cumulative evidence of the same fact, *see id.*, or when a defendant fails to challenge other, cumulative evidence of the same fact on appeal. *See Estrada v. State*, 313 S.W.3d 274, 302 n.29 (Tex. Crim. App. 2010) (citing *Leday* and applying rule where appellate challenge to other, cumulative evidence showing the same fact was overruled);

---

[12]Although the State had notified Mayo that it intended to enhance his punishment based on his prior Mississippi felony conviction, it did not do so. *See* Tex. Penal Code Ann. § 12.42(a).

*Redmond v. State*, No. 02-19-00381-CR, 2021 WL 1134410, at \*11–12 (Tex. App.—Fort Worth Mar. 25, 2021, pet. filed) (citing *Leday* and applying rule where other, cumulative evidence was not challenged on appeal); *Qualls v. State*, 547 S.W.3d 663, 681–82 (Tex. App.—Fort Worth 2018, pet. ref'd) (citing *Leday* and applying rule where appellate challenge to other, cumulative evidence was overruled); *Honish v. State*, No. 02-11-00407-CR, 2013 WL 1759903, at \*4 (Tex. App.—Fort Worth Apr. 25, 2013, pet. ref'd) (mem. op., not designated for publication) (citing *Leday* and applying rule where other, cumulative evidence was not challenged on appeal).

### 2. Deputy Scudder's Testimony

Mayo contends that the trial court erred by allowing Deputy Scudder to testify that he believed Mayo's weaving maneuvers were an attempt "to get other vehicles to crash." Mayo objected to this testimony as speculative at trial and he lodges the same complaint on appeal.[13] Assuming without deciding that this testimony was speculative, the same speculation came in through other evidence that Mayo does not challenge on appeal; namely, Deputy Tharp's dash-camera video.

In Deputy Tharp's dash-camera video, Deputy Scudder can be heard through the police radio stating that Mayo was "turning his headlights on and off and swerving

---

[13]Mayo alternatively challenges this testimony as an improper expert opinion. However, Deputy Scudder was not proffered as an expert, and Mayo did not object to Deputy Scudder's challenged statement as improper expert testimony. *See* Tex. R. App. P. 33.1(a)(1).

10

all across traffic *trying to cause other accidents.*" [14] [Emphasis added.] And again, later in the chase, Deputy Scudder can be heard on the police radio observing, "Every time there's a vehicle in the right lane, [Mayo] gets in the right lane and heads that up and then swerves off really quickly; *it's like he's trying to cause an accident.*" [Emphasis added.] Deputy Scudder's challenged trial testimony was thus a repetition of the statements he made through the police radio on the night of the chase. Because the dash-camera video containing these statements is not challenged on appeal, any error in the admission of Deputy Scudder's speculative testimony was harmless. *See Estrada*, 313 S.W.3d at 302 n.29; *Redmond*, 2021 WL 1134410, at *11–12.

### 3. Statements in Deputy Scudder's Body-Camera Footage

Next, Mayo challenges the statements captured on Deputy Scudder's body-camera footage. Mayo contends that Deputy Scudder's "narrative recorded on his body cam[era]" during the chase—i.e., Deputy Scudder's descriptions of Mayo's behavior, which the deputy reported over the police radio—constituted "inadmissible hearsay" erroneously admitted at trial. Although the precise scope of Mayo's

---

[14]At trial, Mayo's own counsel elicited testimony from Deputy Tharp confirming that the chatter heard on his dash-camera video reflected conversations between Deputy Tharp, Deputy Scudder, other Parker County deputies involved in the chase, and dispatch.

challenge is ambiguous, he appears to target nine specific statements in the deputy's body-camera footage as objectionable hearsay.[15]

But the nine challenged statements were not unique to Deputy Scudder's body-camera footage. Many of these statements were recorded by Deputy Scudder's dash camera or transmitted over the police radio and recorded by Deputy Tharp's dash camera. And even those statements that were not captured verbatim on a dash-camera video were repeated and recorded later in the chase and repeated again at trial in substantially similar form.

- First, Mayo challenges Deputy Scudder's observation "that it looks like [Mayo] almost struck a vehicle and ran him off the road." This statement occurred during the first two minutes of Deputy Scudder's body-camera footage and was

---

[15]The following paragraph of Mayo's brief highlights the allegedly objectionable hearsay in Deputy Scudder's body-camera footage:

> [(1)] At about 1:15 into State's exhibit 3, Deputy Scudder says that it looks like Appellant almost struck a vehicle and ran him off the road. [(2)] He also says that his speed has gone up to about 90 mph. [(3)] Around 1:50, the narrator says that Appellant's speed has exceeded a hundred mph and [(4)] that he has "killed his headlights and taillights again." [(5)] After 4:00, Appellant's speed is announced at 108 mph, and [(6)] it is alleged that he is "swerving at vehicles." [(7)] Before the six-minute mark, the officer accuses Appellant of getting close to cars then suddenly swerving to the right lane. [(8)] At 14:30 is another reference to Appellant trying to cause accidents. This narration continues throughout the video. [(9)] Importantly, at about 21:25, Scudder proclaims, "Every time there's a vehicle in the right lane, he gets in the right lane and heads that up . . . and then swerves off really quickly; it's like he's trying to cause an accident."

Our analysis reorders and groups these nine statements based on content.

thus also recorded on Deputy Scudder's dash-camera video. Mayo does not challenge the admission of the dash-camera video on appeal.

- Next, Mayo attacks three of Deputy Scudder's statements reporting Mayo's speed as 90 mph, 100 mph, and 108 mph. But throughout the dash-camera videos, Deputies Scudder and Tharp can be heard periodically reporting Mayo's speed—or the speed of the police caravan keeping up with Mayo—over the police radio. On the videos, the deputies reported speeds of 90 mph, 108 mph, "increasing again going about 109," about 110 mph, "still at 110," "114 mph," "115," "about 108," and "106 mph." Neither dash-camera video is challenged on appeal.

- The fifth statement Mayo challenges is Deputy Scudder's observation that Mayo "killed his headlights and taillights again." However, Deputy Tharp's dash-camera video recorded Deputy Scudder uttering a nearly identical statement over the police radio later in the chase; Deputy Scudder can be heard reporting that Mayo "keeps turning his headlights on and off." As noted previously, Mayo does not challenge Deputy Tharp's dash-camera video on appeal.

- In the sixth and seventh statements Mayo targets, Deputy Scudder reported that Mayo was "swerving at vehicles." Again, Deputy Tharp's unchallenged dash-camera video contained nearly identical statements. In this unchallenged

13

footage, Deputy Scudder stated that Mayo was "swerving all across traffic," while Deputy Tharp stated that "[Mayo]'s weaving in and out of semis," "[Mayo]'s literally weaving at traffic," and Mayo was "[s]till swerving at cars." Mayo's counsel elicited similar testimony from Deputy Scudder at trial: Deputy Scudder told the jury that Mayo "was swerving at the vehicles." Mayo does not challenge any of this cumulative evidence on appeal.

- Mayo's final two challenged statements are comments regarding Mayo's attempts to cause accidents and his "getting close to cars then suddenly swerving to the right lane." Mayo emphasizes as particularly objectionable Deputy Scudder's observation that "[e]very time there's a vehicle in the right lane, [Mayo] gets in the right lane and heads that up . . . and then swerves off really quickly; it's like he's trying to cause an accident." But this same statement can be heard just as clearly through the police radio in Deputy Tharp's dash-camera footage. And, as discussed above in reference to Deputy Scudder's allegedly speculative trial testimony, Deputy Tharp's dash camera recorded multiple statements from Deputy Scudder speculating that Mayo was "trying to cause other accidents." *See supra* Section II.A.2. Deputy Tharp even reiterated this impression at trial; he testified that Mayo "appeared [to be] trying to run [other vehicles] off the road." Again, Mayo does not challenge any of this cumulative evidence on appeal.

14

Because the nine challenged statements in Deputy Scudder's body-camera footage were cumulative of other testimony and video not challenged on appeal, any error in the admission of these statements was harmless. *See Estrada*, 313 S.W.3d at 302 n.29; *Redmond*, 2021 WL 1134410, at \*11–12.

We overrule Mayo's evidentiary challenges.

## B. Deadly-Weapon Finding

In Mayo's remaining issue, he claims that the evidence was insufficient to support the jury's deadly-weapon finding because, according to Mayo, "[t]he State's evidence showed only a potential for danger, not 'actual danger.'"

### 1. Standard of Review and Applicable Law

In our evidentiary-sufficiency review, we consider all the evidence in the light most favorable to the verdict to determine whether any rational factfinder could have found, beyond a reasonable doubt, that Mayo used his vehicle as a deadly weapon. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); *Couthren v. State*, 571 S.W.3d 786, 789 (Tex. Crim. App. 2019); *Queeman v. State*, 520 S.W.3d 616, 622 (Tex. Crim. App. 2017). A motor vehicle may be found to be a deadly weapon if "the manner of its use or intended use is capable of causing death or serious bodily injury." Tex. Penal Code Ann. § 1.07(a)(17); *Couthren*, 571 S.W.3d at 789. A vehicle is not "capable of causing death or serious bodily injury" unless its manner of use presents an "actual danger" of causing such harm. *Drichas v. State*, 175 S.W.3d 795, 799–800

15

(Tex. Crim. App. 2005); *see Moore v. State*, 520 S.W.3d 906, 912–13 (Tex. Crim. App. 2017).

When reviewing the sufficiency of a deadly-weapon finding based on the defendant's driving, we conduct a two-part analysis: "[F]irst, we evaluate the manner in which the defendant used the motor vehicle during the felony" to determine if it was reckless or dangerous; and "second, we consider whether, during the felony, the motor vehicle was capable of causing death or serious bodily injury." *Sierra v. State*, 280 S.W.3d 250, 255 (Tex. Crim. App. 2009). Admittedly, the two parts of this analysis are often related, if not inextricably intertwined. *See, e.g.*, *Moore*, 520 S.W.3d at 911–13 (addressing the two parts of the analysis together and recognizing that the court of appeals stated the dangerousness analysis "dovetail[ed]" with the actual-danger analysis).

## 2. Actual Danger

Here, Mayo acknowledges that "[t]here was evidence that [he] was speeding and swerving" in a dangerous manner while "other cars were present on the highway," but he contends that the evidence demonstrated only a "hypothetical potential" for injury. According to Mayo, the State "could not point to anyone who was actually in danger from [Mayo]'s driving."

Mayo does not identify the vital missing ingredient he believes is necessary to elevate the facts of this case to "actual danger," and we find none. Surely Mayo does not contend that "actual danger" only exists if it culminates in actual bodily injury to a

16

specific motorist; case law dictates otherwise, as does common sense. *See, e.g., id.* at 913 (holding that Moore's use of his vehicle was capable of causing death or serious bodily injury "even though it did not do so, and regardless of whether he intended it to"). Indeed, the Court of Criminal Appeals has distinguished between "a deadly weapon's *capability* of causing death or serious bodily injury [and] its *probability* of doing [so]," *Drichas*, 175 S.W.3d at 799–800,[16] and the Court has recognized that "[e]ven an 'actual' danger is just a potentiality." *Moore*, 520 S.W.3d at 913 n.8 (citing Black's Law Dictionary for the definition of "danger" as "[p]eril; *exposure* to harm, loss, pain, or other negative result"). "The difference between an actual 'exposure' to death or serious bodily injury and a hypothetical 'exposure' to such an injury is necessarily only one of degree." *Id.* at 913. Evidence of actual danger does not require a showing that other motorists were forced to take evasive action, that other motorists were in the zone of danger, or that the defendant actually caused a collision; it merely requires a showing that "the manner of [the defendant's] use of his motor vehicle substantially 'exposed' [another individual] . . . to death or serious bodily injury." *Id.*; *Drichas*, 175 S.W.3d at 799.

The facts of this case are sufficient to support a jury finding that the manner in which Mayo used his vehicle exposed other highway motorists to death or serious

---

[16]At the time *Drichas* was issued, the Court of Criminal Appeals still distinguished between the legal and factual sufficiency standards of review. *Cf. Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010) (plurality op.).

17

bodily injury.[17]   The record reveals that Mayo drove his vehicle at extremely high speeds—over 100 mph—in low-visibility conditions, talking on his cell phone "[p]ractically the entire time," turning his headlights on and off, [SX4(8:40-8:50)] and aggressively tailgating and swerving around other vehicles.  *See Hazlewood v. State*, No. 02-18-00372-CR, 2019 WL 2635567, at *2 (Tex. App.—Fort Worth June 27, 2019, pet. ref'd) (mem. op., not designated for publication) (upholding deadly-weapon finding where Hazlewood "drove at high speeds [of up to 90 mph]" and "led a group of officers on a 32-minute high-speed chase, apparently while talking on his cell phone for at least part of the time"); *Govea v. State*. No. 02-16-00368-CR, 2017 WL 3429144, at *1–4 (Tex. App.—Fort Worth Aug. 10, 2017, no pet.) (mem. op., not designated for publication) (upholding deadly-weapon finding where Govea led an officer on a high-speed chase, drove over 100 mph, and passed vehicles on the shoulder).

Less than one minute after the chase began, Deputy Scudder's dash camera recorded Mayo tailgating another vehicle until both cars swerved off the road—narrowly avoiding a collision at highway speeds, sending Mayo's vehicle into a spin, and forcing the other motorist onto the parallel service road.  *See Mann v. State*, 13 S.W.3d 89, 92 (Tex. App.—Austin 2000) (upholding deadly-weapon finding where Mann drove across the center line and "almost hit another vehicle head-on," forcing

---

[17]The relevant time period for determining whether Mayo's vehicle was used as a deadly weapon is the time period during Mayo's evasion from Deputy Scudder.  *See Cates v. State*, 102 S.W.3d 735, 738 (Tex. Crim. App. 2003).

the ongoing vehicle to take "evasive action" to avoid the collision), *aff'd*, 58 S.W.3d 132 (Tex. Crim. App. 2001) (adopting lower court's opinion regarding deadly-weapon finding). Deputy Scudder described the incident in his testimony, and he indicated that, despite this near collision, Mayo continued to aggressively tailgate other vehicles in a similar manner throughout the chase. The deputy confirmed that if the other motorists had "hit the brakes or slowed down or something, [it] could have caused a wreck."

In addition to tailgating, Mayo swerved in between, in front of, and "at" other vehicles. Deputy Tharp testified that he "observed vehicles having to hit their brakes, especially semis, when [Mayo] cut around on the right shoulder and came back through" them. *See Govea*, 2017 WL 3429144, at *3–4 (upholding deadly-weapon finding where Govea wove in between vehicles and "several of them were forced to take evasive actions . . . to prevent colliding with Govea"). Deputy Scudder described a similar weaving incident on an exit ramp; he testified that Mayo used the ramp to cut in front of two vehicles driving in the two main lanes of the interstate by driving in the exit lane, passing an exiting eighteen-wheeler on the right, then cutting in front of the eighteen-wheeler—"thread[ing] the needle" between the truck and the vehicle in front of it—to swerve back onto the interstate across the triangular exit-demarcation lines.

Deputies Scudder and Tharp both confirmed that Mayo's driving was "capable of causing a wreck." In fact, the deputies told the jury that "it appeared [Mayo] was

19

trying to run [other vehicles] off the road," or "make them wreck."—an impression supported by the brief sample of Mayo's driving recorded on Deputy Scudder's dash-camera video. The deputies further testified that had a wreck occurred, it could have "caused death or serious bodily injury." Indeed, the fact that Deputy Scudder, Deputy Tharp, and multiple other law-enforcement personnel risked their own safety to chase Mayo and the fact that they repeatedly blocked highway lanes with spike strips in an attempt to stop his vehicle attest to the gravity of the danger they believed Mayo's driving presented. *See Hazlewood*, 2019 WL 2635567, at *2 (upholding deadly-weapon finding where Hazlewood "caused officers to block the road in an attempt to stop him"). The jury was entitled to believe the deputies' testimony and to agree with the deputies' assessment of Mayo's driving. *See Hernandez v. State*, 161 S.W.3d 491, 500 (Tex. Crim. App. 2005) ("[T]he trier of fact . . . was free to accept or reject all or any portion of any witness's testimony." (quoting *Adelman v. State*, 828 S.W.2d 418, 421 (Tex. Crim. App. 1992))).

In sum, the facts of this case are more than sufficient to allow a reasonable jury to find that the manner in which Mayo drove his vehicle presented an actual danger of death or serious bodily injury. We overrule Mayo's sufficiency challenge.

## C. Clerical Errors in Judgment

We raise a final issue sua sponte: there are clerical errors in the judgment.

We may modify errors in the judgment sua sponte if they are clerical errors that the trial court could have corrected by a judgment nunc pro tunc and the information

20

necessary to correct the judgment appears in the record. *Cain v. State*, 621 S.W.3d 75, 88 (Tex. App.—Fort Worth 2021, no pet. h.); *Ette v. State*, 551 S.W.3d 783, 792 (Tex. App.—Fort Worth 2017), *aff'd*, 559 S.W.3d 511 (Tex. Crim. App. 2018). Clerical errors are those that do not result from judicial reasoning or determination, such as typographical mistakes. *Ex parte Poe*, 751 S.W.2d 873, 876 (Tex. Crim. App. 1988); *Cain*, 621 S.W.3d at 88.

There are multiple clerical mistakes in Mayo's written judgment that do not accurately reflect the trial proceedings. Although Mayo elected to have the trial court assess his punishment, portions of the judgment erroneously indicate that Mayo elected to have the jury assess his punishment. For example, the main title on the first page[18] of Mayo's judgment reads, in relevant part: "Jury Finding of Guilt *with Punishment Assessed by the Jury*." [Capitalization altered and emphasis added.] Then, the second page of the written judgment states that Mayo "elected to have punishment assessed by the jury," and it recites an entire paragraph of jury-related punishment procedures that allegedly occurred.[19] In reality, none of these jury-related punishment

---

[18]Curiously, the headers on the last two pages of Mayo's three-page judgment bear the proper title: "Judgment on Plea of Not Guilty[;] Jury Finding of Guilt With Punishment Assessed by the Court[;] Penitentiary Sentence."

[19]The inapplicable paragraph on page two of Mayo's judgment reads:

Thereafter, the Defendant, having elected to have punishment assessed by the jury, the enhancement paragraph(s), if any, were read and the Defendant entered the plea to said enhancement paragraph(s) noted above. Thereafter, the jury, having heard the evidence submitted relative

procedures actually happened.  Yet, the judgment goes on to order that Mayo shall "be punished in accordance with the Jury Verdict."  Again, the jury did not return a verdict on punishment; punishment was to the court.

Because the written judgment does not accurately document Mayo's sentencing, we modify Mayo's written judgment to reflect that punishment was tried to and assessed by the trial court.  Tex. R. App. P. 43.2(b).

## IV.  CONCLUSION

Having overruled Mayo's points and modified the judgment to reflect the record, we affirm the trial court's judgment as modified.

/s/ Dabney Bassel

Dabney Bassel
Justice

Do Not Publish
Tex. R. App. P. 47.2(b)

Delivered:  June 24, 2021

---

to the question of punishment, the arguments of counsel, and having been duly charged by the Court, retired in charge of the proper officer to consider the verdict, and afterward were brought into Court by the proper officer, the Defendant and defendant's counsel being present, and returned into open Court the verdict set forth above under punishment above, and with regard to the enhancement paragraphs, if any, as shown above, which was received by the Court and is here now entered upon the minutes of the Court as shown above.

22